[No. S050952. Dec. 12, 1996.]

RUBY ROSENTHAL et al., Plaintiffs and Respondents, v.
GREAT WESTERN FINANCIAL SECURITIES CORPORATION et al.,
Defendants and Appellants.

**COUNSEL**

Morrison & Foerster, Shirley M. Hufstedler, Maren E. Nelson and David K. Barrett for Defendants and Appellants.

Michael B. Dashjian, Steven Drapkin, Lee W. Rierson, Proskauer, Rose, Goetz & Mendelsohn, Jeffrey A. Berman, Daniel E. Eaton, Paul, Hastings, Janofsky & Walker and Paul Grossman as Amici Curiae on behalf of Defendants and Appellants.

Michael Linfield, Laurence B. Frank, Hadsell & Stormer, Dan Stormer, Virginia Keeny, Anne Richardson and Randy Renick for Plaintiffs and Respondents.

The Sturdevant Law Firm, Ann Saponara, McGuinn, Hillsman & Palefsky, Cliff Palefsky and Keith Ehrman as Amici Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**WERDEGAR, J.**—In this case involving the enforcement of a predispute arbitration clause in a client agreement executed in the purchase of securities, we address the procedures by which petitions to compel arbitration (Code Civ. Proc., § 1281.2) are to be determined in the superior courts. We conclude that while the client agreements here are subject to the United States Arbitration Act (9 U.S.C. §§ 1-16), the federal provision for a jury trial of questions regarding the existence of an arbitration agreement (9 U.S.C. § 4) does not operate in California state courts. We further conclude the state constitutional guarantees of due process of law and jury trial (Cal. Const., art. I, §§ 7, 16) do not entitle a party opposing arbitration to a jury trial on the existence or validity of the arbitration agreement. Rather, these questions are to be resolved by the trial court in the manner provided for the hearing and decision of motions (Code Civ. Proc., § 1290.2), either on the basis of affidavits or declarations or, in the exercise of the court's discretion where necessary to resolve material conflicts in the written evidence, upon live testimony.

On the merits of defendants' petition to compel arbitration, plaintiffs claim the arbitration agreements are void for fraud in their execution. We hold most of the plaintiffs did not present legally sufficient evidence that they reasonably relied on fraudulent representations as to the essential character of the client agreements they signed, so as to render the agreements void for fraud in the execution. (*C. I. T. Corporation* v. *Panac* (1944) 25 Cal.2d 547, 548-549 [154 P.2d 710, 160 A.L.R. 1285].) We will conclude the petition to compel arbitration should be granted as to these plaintiffs. A smaller number of plaintiffs have presented potentially sufficient evidence of fraud in the execution; as to these plaintiffs, we will conclude a remand for additional fact finding is required.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs are 24 individuals, 23 of whom, through defendant Great Western Financial Securities Corporation (GWFSC), invested in stock and bond

mutual funds. (The remaining plaintiff, Michael Zinzun, sues "under Business & Professions Code §§ 17000, 17200 and 17500 on behalf of the general public.") Before making these investments, most plaintiffs were depositors with Great Western Bank (GWB), a separate corporation related to GWFSC.[1] They allege representatives of both corporations led them to believe that the GWFSC representatives actually worked for GWB, that funds sold by GWFSC were, or were as secure as, insured deposits with GWB, and that the GWFSC funds were backed by GWB or by the United States Government. Plaintiffs allege the value of the GWFSC funds subsequently declined and they lost portions of their principal. The complaint names as defendants several individual GWFSC representatives, as well as GWFSC and GWB, and sets forth causes of action for breach of fiduciary duty, fraud, negligent misrepresentation, intentional and negligent infliction of emotional distress, unfair business practices and invasion of privacy.

GWFSC and four individual defendants employed by GWFSC (collectively GWFSC) petitioned the superior court for an order compelling arbitration of all claims made by most plaintiffs, on the ground these plaintiffs had executed client agreements containing a predispute arbitration clause.[2] In opposition to the petition, plaintiffs asserted two grounds for not enforcing the arbitration agreement: "that there was fraud in the inception of the contract" and that "the contracts they signed were 'permeated with fraud.'"

While arguing fraud *allegations* alone were sufficient to avoid arbitration, plaintiffs each submitted, in addition, a declaration under penalty of perjury purportedly showing the existence of fraud in the inception of, or "permeating," the client agreements. These declarations will be reviewed in detail later in this opinion; in broadest outline, and as relevant to enforceability of the arbitration agreements, the declarations contain evidence plaintiffs, most of whom were longtime GWB depositors, were led to believe the GWFSC representatives worked for GWB; plaintiffs therefore placed trust and confidence in the representatives; the representatives materially misrepresented the nature of the investments being sold; the representatives did not tell plaintiffs the client agreement contained an arbitration clause; and the representatives assured plaintiffs, in various ways, that the written client

---

[1]The exact corporate relationship between GWB and GWFSC is not clear from the briefing, and is not important to this appeal. Plaintiff's counsel represented below that both are owned by a parent corporation, Great Western Financial Corporation (GWFC), which is also a defendant here. The complaint alleges GWFSC is a subsidiary of GWFC, which in turn is an "independent affiliate" of GWB.

[2]GWFSC did not seek arbitration as to plaintiffs Zinzun (the public plaintiff) and Lee and Maxwell Trent, and did not claim they had signed arbitration agreements.

agreement was a mere formality needed to open the "account." GWFSC countered these with declarations from the representatives who had sold plaintiffs the subject funds, and who denied making the claimed fraudulent statements.

GWFSC, citing *Strauch* v. *Eyring* (1994) 30 Cal.App.4th 181 [35 Cal.Rptr.2d 747], argued that, although these agreements for the purchase of stock and bond funds were governed by the United States Arbitration Act, 9 United States Code sections 1-16 (the USAA), the USAA's provision for jury trial on the existence of an arbitration agreement (9 U.S.C. § 4) does not apply in state court. For that reason, GWFSC asserted, plaintiffs' *allegations* of fraud, by themselves, were an insufficient basis for denying the petition. GWFSC further maintained the facts alleged and shown by plaintiffs' declarations were insufficient, under the applicable federal substantive law of enforceability, to avoid arbitration on either asserted theory of fraud ("inception" or "permeation").

At a nonevidentiary hearing on the petition, the trial court questioned counsel as to whether and how it was to resolve the factual conflicts presented by the declarations. "[I]s it the court's role at this stage to resolve these factual issues or . . . is it sufficient for the plaintiff to [raise] factual issues?" Ultimately, the trial court agreed with GWFSC that the USAA's provision for jury trial did not apply in state court. Nonetheless, without holding an evidentiary hearing, the court denied the petition to arbitrate as to all but one of the plaintiffs "on grounds that each of the above-named plaintiffs presented sufficient evidentiary support for their allegations of fraud in the inception of the arbitration agreement." The court granted the petition as to one plaintiff (Alfred Patrick), because he "did not present evidence of sufficient substantiality to support a claim of fraud in the inception of the arbitration clause."

GWFSC appealed the ruling denying its petition to compel as to 20 plaintiffs. (Code Civ. Proc., § 1294, subd. (a).) The Court of Appeal held the superior court erred in determining plaintiffs were not entitled to a jury trial under section 4 of the USAA. Relying on prior Court of Appeal decisions, beginning with *Main* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1977) 67 Cal.App.3d 19 [136 Cal.Rptr. 378], and declining to follow what it deemed dictum in *Strauch* v. *Eyring, supra,* 30 Cal.App.4th 181, the appellate court held the federal jury trial provision was applicable in a California court. The court did not address the merits of plaintiffs' fraud claims. Instead, it remanded for the trial court to determine whether plaintiffs have

sufficiently alleged fraud in the making of the arbitration agreement, and if so to try, by jury if requested, the issue of whether the arbitration agreements were the result of fraud.

We granted GWFSC's petition for review.

DISCUSSION

I. *Trial Court Procedure for Deciding a Petition to Compel Arbitration*

A. *Section 4 of the United States Arbitration Act*

The parties correctly agree that because the transactions here involved interstate commerce, questions concerning arbitrability of the parties' dispute are governed by the USAA. (See 9 U.S.C. §§ 1, 2.) The primary substantive provision of the USAA is section 2, which provides: "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.)

"Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [USAA]." (*Moses H. Cone Hospital* v. *Mercury Const. Corp.* (1983) 460 U.S. 1, 24 [74 L.Ed.2d 765, 785, 103 S.Ct. 927] (*Moses H. Cone*).) The rule of enforceability established by section 2 of the USAA preempts any contrary state law and is binding on state courts as well as federal. (*Southland Corp.* v. *Keating* (1984) 465 U.S. 1, 10-16 [79 L.Ed.2d 1, 11-16, 104 S.Ct. 852] (*Southland Corp.*).)

The policy of enforceability stated in section 2 of the USAA is implemented in the remaining sections of the USAA, especially sections 3 and 4, which concern attempts to resist arbitration or to litigate an issue subject to arbitration. Section 3 requires any court "of the United States" to grant a party's request for a stay of litigation on an arbitrable issue, pending completion of the arbitration. (9 U.S.C. § 3.) Section 4 requires a "United

States district court" to entertain an application to compel arbitration. (9 U.S.C. § 4.) Five days' notice of the application is required, to be served on the party in default "in the manner provided by the Federal Rules of Civil Procedure." (*Ibid.*) The court is to order arbitration if satisfied "that the making of the agreement for arbitration or the failure to comply therewith is not in issue." If such an issue *is* presented, the court is to "proceed summarily to the trial thereof." (*Ibid.*) Despite the summary nature of the proceeding, the party resisting arbitration may demand a jury trial on issues of the existence of the arbitration agreement or the party's default thereunder. Upon this demand, the court is to refer the matter to a jury "in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose." (*Ibid.*)[3]

In most important respects, the California statutory scheme on enforcement of private arbitration agreements is similar to the USAA; the similarity is not surprising, as the two share origins in the earlier statutes of New York and New Jersey. (See Recommendation and Study Relating to Arbitration (Dec. 1960) 3 Cal. Law Revision Com. Rep. (1961) p. G-28 (Law Revision Commission Study); Feldman, *Arbitration Law in California: Private Tribunals for Private Government* (1957) 30 So.Cal.L.Rev. 375, 388, fn. 45.) Code of Civil Procedure section 1281, like section 2 of the USAA, provides that predispute arbitration agreements are "valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." Code of Civil Procedure section 1281.2 (hereafter section 1281.2), like the USAA's section 4, provides a procedure by which a party may petition the court to order arbitration of a controversy. Under section 1281.2, as under section 4 of the USAA, the court may deny the application if it finds the party resisting arbitration did not in fact agree to arbitrate.[4] Like section 3 of the USAA, Code of Civil Procedure section 1281.3 provides that when a court has ordered arbitration of a controversy, any pending litigation on the same

---

[3]Section 5 of the USAA concerns court appointment of an arbitrator upon failure of the agreed method. Section 6 provides that "[a]ny application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions, except as otherwise herein expressly provided." (9 U.S.C. § 6.) Section 7 provides for court enforcement of arbitrators' summonses of witnesses. Section 8 concerns proceedings in admiralty cases. Sections 9 through 13 set standards and procedures for court confirmation, correction and vacation of arbitrators' awards. Section 14 limits retroactivity of the USAA. Section 15 concerns the Act of State doctrine. Section 16 provides for an appeal from specified orders made under the USAA. (9 U.S.C. §§ 5-16.)

[4]Section 1281.2 also makes explicitly clear that the petition may be denied, as well, if the petitioner has waived its right to compel arbitration, or if grounds exist for revocation of the arbitration agreement.

controversy is to be stayed.[5] In one important respect, however, section 1281.2 differs from section 4 of the USAA: The California statute does not provide for a jury trial of issues as to the making of the arbitration agreement or the resisting party's default thereunder. Instead, our statutory scheme requires petitions to compel arbitration to be determined "in the manner . . . provided by law for the making and hearing of motions." (Code Civ. Proc., § 1290.2 (hereafter section 1290.2).)

The question thus arises whether section 4 of the USAA, or sections 1281.2 and 1290.2, provide the procedure to be followed in a California court in a case where the USAA governs arbitrability of the controversy. As noted, the Courts of Appeal have reached differing results on this question. (Compare *Strauch* v. *Eyring, supra,* 30 Cal.App.4th at p. 186 [jury trial provision of the USAA's section 4 "does not apply in state court proceedings"] with *Main* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc., supra,* 67 Cal.App.3d at pp. 24-25 [noting the USAA "provides for a 'trial,' by jury if requested," and that "[t]he proceedings below . . . were controlled by the [USAA]"], *Rice* v. *Dean Witter Reynolds, Inc.* (1991) 235 Cal.App.3d 1016, 1025, fn. 4 [1 Cal.Rptr.2d 265] [State court litigant "is entitled to a jury trial on the issue of fraud. (9 U.S.C. § 4.)"], and *Strotz* v. *Dean Witter Reynolds, Inc.* (1990) 223 Cal.App.3d 208, 210, fn. 1 [272 Cal.Rptr. 680] [Under the USAA, as applicable in state court, "the parties are entitled to a jury trial of the issue whether a valid agreement to arbitrate exists."].) In light both of the specific language of the USAA and of general principles of federal preemption, we conclude the USAA does not require California courts to hold a jury trial on the existence of an arbitration agreement.[6] The Court of Appeal decisions just cited are disapproved to the extent they reach the opposite conclusion.

Section 4 of the USAA does not explicitly govern the procedures to be used in state courts. As already noted, the statute contemplates a petition in "United States district court," and provides that certain steps are to be taken "in the manner provided by the Federal Rules of Civil Procedure." This

---

[5]Unlike the federal law, however, section 1281.2 allows the court, in certain circumstances, to instead deny or stay arbitration pending completion of related litigation.

[6]Appellate courts in several other states have similarly found various of the USAA's procedural provisions inapplicable in state court. (See *Atlantic Painting & Contracting Inc.* v. *Nashville Bridge Co.* (Ky. 1984) 670 S.W.2d 841, 846; *Martin* v. *Norwood* (1985) 395 Mass. 159 [478 N.E.2d 955, 958]; *McClellan* v. *Barrath Constr. Co., Inc.* (Mo.Ct.App. 1987) 725 S.W.2d 656, 658-659; *Jack B. Anglin Co., Inc.* v. *Tipps* (Tex. 1992) 842 S.W.2d 266, 268, 272; but see *Merrill Lynch Pierce etc.* v. *Melemed* (Fla.Dist.Ct.App. 1981) 405 So.2d 790, 793 [pre-*Southland Corp.* decision holding USAA section 3 applicable in state court].) The parties have not cited, and we have not discovered, any foreign decisions holding section 4's jury trial provision applicable in state court.

language has led the United States Supreme Court to express its doubt that section 4 is applicable in state courts. Thus, in *Southland Corp.*, *supra*, 465 U.S. 1, 16, footnote 10 [79 L.Ed.2d 15], the court explained: "In holding that the Arbitration Act preempts a state law that withdraws the power to enforce arbitration agreements, we do not hold that §§ 3 and 4 of the Arbitration Act apply to proceedings in state courts. Section 4, for example, provides that the Federal Rules of Civil Procedure apply in proceedings to compel arbitration. The Federal Rules do not apply in such state-court proceedings." In *Volt Info. Sciences* v. *Leland Stanford Jr. U.* (1989) 489 U.S. 468, 477 [103 L.Ed.2d 488, 498-499, 109 S.Ct. 1248], the high court again declined to decide the issue, which it stated had been "expressly reserv[ed]" in *Southland Corp.* The court remarked that sections 3 and 4 "by their terms appear to apply only to proceedings in federal court." (*Volt Info. Sciences* v. *Leland Stanford Jr. U.*, *supra*, 489 U.S. at p. 477, fn. 6 [103 L.Ed.2d at p. 499].)

Although the wording of section 4 of the USAA thus suggests it is limited to federal courts, that language is not completely dispositive, in that section 2 of the USAA, by contrast, has no such restricted range. Under the holding in *Southland Corp.*, section 2's rule of enforceability of arbitration clauses preempts contrary state law even in a state court proceeding. But the federal policy of ensuring enforcement of private arbitration agreements, centrally embodied in section 2, is not self-implementing; its effectuation requires that courts have available some procedure by which a party seeking arbitration may compel a resisting party to arbitrate. Section 4 of the USAA establishes one such procedure; state law may or may not provide for other equivalent or similar procedures. If no adequate state procedures are provided, state courts may, in order fairly to adjudicate a federal claim for enforcement of an arbitration agreement, be obliged to adopt a procedure similar in its essentials to that set out in the USAA. As the high court has previously explained (albeit with reference to section 3 of the USAA, rather than section 4), "[t]his is necessary to carry out Congress' intent to mandate enforcement of all covered arbitration agreements; Congress can hardly have meant that an agreement to arbitrate can be enforced against a party who attempts to litigate an arbitrable dispute in federal court, but not against one who sues on the same dispute in state court." (*Moses H. Cone*, *supra*, 460 U.S. at p. 26, fn. 34 [74 L.Ed.2d at p. 786].) That section 2 of the USAA *does* preempt contrary state law is established; it follows that a state procedural statute or rule that frustrated the effectuation of section 2's central policy would, where the federal law applied, be preempted by the USAA.

The question whether a jury trial is called for thus requires us to go beyond the language of section 4 of the USAA and apply broader principles

of federal preemption. ▇ It is a "general and unassailable proposition . . . that States may establish the rules of procedure governing litigation in their own courts," even when the controversy is governed by substantive federal law. (*Felder* v. *Casey* (1988) 487 U.S. 131, 138 [101 L.Ed.2d 123, 137, 108 S.Ct. 2302].) "By the same token, however, where state courts entertain a federally created cause of action, the 'federal right cannot be defeated by the forms of local practice.' " (*Ibid.*) Thus, as we have previously recognized, a state procedural rule must give way "if it impedes the uniform application of the federal statute essential to effectuate its purpose, even though the procedure would apply to similar actions arising under state law." (*McCarroll* v. *L.A. County etc. Carpenters* (1957) 49 Cal.2d 45, 61, 62 [315 P.2d 322].) At a minimum the state procedure must be neutral as between state and federal law claims. (*Howlett* v. *Rose* (1990) 496 U.S. 356, 372 [110 L.Ed.2d 332, 350-351, 110 S.Ct. 2430].) More exactingly, the state rule may be preempted if it would stand " ' "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ' " (*Felder* v. *Casey*, *supra*, 487 U.S. at p. 138 [101 L.Ed.2d at p. 138].) Uniform national application of a federal substantive law requires, in particular, that state courts not apply procedural rules that would "frequently and predictably produce different outcomes . . . based solely on whether the [federal] claim is asserted in state or federal court." (*Ibid.*)

▇ Like other federal procedural rules, therefore, "the procedural provisions of the [USAA] are not binding on state courts . . . *provided applicable state procedures do not defeat the rights granted by Congress.*" (*McClellan* v. *Barrath Constr. Co., Inc.*, *supra*, 725 S.W.2d at p. 658, italics added.) We think it plain the California procedures for a summary determination of the petition to compel arbitration serve to further, rather than defeat, the enforceability policy of the USAA. Sections 1281.2 and 1290.2 are neutral as between state and federal law claims for enforcement of arbitration agreements. They display no hostility to arbitration as an alternative to litigation; to the contrary, the summary procedure provided, in which the existence and validity of the arbitration agreement is decided by the court in the manner of a motion, is designed to further the use of private arbitration as a means of resolving disputes more quickly and less expensively than through litigation.[7] Finally, having a court, instead of a jury, decide whether an arbitration agreement exists will not "frequently and predictably produce different outcomes." (*Felder* v. *Casey*, *supra*, 487 U.S. at p. 138 [101

---

[7]Prior to the Legislature's general revision of our arbitration law in 1961, the California statute on petitions to compel (Code Civ. Proc., former § 1282) closely paralleled section 4 of the USAA, including the jury trial provision. (See Historical Note, 19A West's Ann. Cal. Code Civ. Proc. (1982 ed.) § 1281.2, p. 247.) The Law Revision Commission's recommendation to eliminate the jury trial provision was based on a conclusion in its commissioned

L.Ed.2d at p. 138].) Because the California procedure for deciding motions to compel serves to further, rather than defeat, full and uniform effectuation of the federal law's objectives, the California law, rather than section 4 of the USAA, is to be followed in California courts.

In a distinct, but related, argument, plaintiffs maintain the use of a motion procedure to decide the petition to compel arbitration violates the USAA because it constitutes a special rule for arbitration agreements, not applicable to contracts generally. As the United States Supreme Court has explained on several occasions, section 2 of the USAA, where applicable, precludes states from "singling out arbitration provisions for suspect status, requiring instead that such provisions be placed 'upon the same footing as other contracts.'" (*Doctor's Associates, Inc.* v. *Casarotto* (1996) 517 U.S. __, __ [134 L.Ed.2d 902, 909, 116 S.Ct. 1652, 1656].) Thus, a substantive state law rule may be applied to agreements subject to the USAA only if the state law "arose to govern issues concerning the validity, revocability and enforceability of contracts generally." (*Perry* v. *Thomas* (1987) 482 U.S. 483, 492, fn. 9 [96 L.Ed.2d 426, 437, 107 S.Ct. 2520]; see also *Southland Corp., supra,* 465 U.S. at p. 16, fn. 11 [79 L.Ed.2d at pp. 15-16].) Contrary to plaintiffs' claim, however, nothing in the California procedures violates this principle. Sections 1281.2 and 1290.2 establish no special rule of nonenforceability applicable only to arbitration agreements. Nor do the California procedures place arbitration agreements at a disadvantage compared to other contracts, or single them out for suspect status. Our statutes do establish procedures for determining enforceability not applicable to contracts generally, but they do not thereby run afoul of the USAA's section 2, which states the principle of equal enforceability, but does not dictate the procedures for determining enforceability. Moreover, section 2, as part of a statutory scheme establishing special procedures for deciding enforceability of arbitration agreements, could not reasonably be interpreted as forbidding the use of such procedures.

### B. *Jury Trial Under the California Constitution*

Plaintiffs contend that if, as we hold above, section 4 of the USAA does not apply in California courts, then the California statutes (sections 1281.2 and 1290.2) must be construed to mandate the trial court make only a preliminary determination of sufficiency of evidence to void the arbitration agreement, with a jury trial of the issue to follow if the evidence of fraud is deemed sufficient. Plaintiffs maintain that allowing the court finally to decide whether the arbitration agreement is void for fraud would deprive

study that jury trial of the preliminary issues could frustrate the use of arbitration as a speedy means of resolving controversies. (Law Rev. Com. Study, *supra*, at p. G-38.)

them of their state constitutional rights to due process and a jury trial. (Cal. Const., art. I, §§ 7, 16.) We find no violation of state constitutional rights in the summary procedure for decision, without a jury, of whether a valid arbitration agreement exists.

A petition to compel arbitration " 'is in essence a suit in equity to compel specific performance of a contract.' " (*Spear* v. *California State Auto. Assn.* (1992) 2 Cal.4th 1035, 1040 [9 Cal.Rptr.2d 381, 831 P.2d 821]; *Freeman* v. *State Farm Mut. Auto. Ins. Co.* (1975) 14 Cal.3d 473, 479 [121 Cal.Rptr. 477, 535 P.2d 341]; *Trubowitch* v. *Riverbank Canning Co.* (1947) 30 Cal.2d 335, 347 [182 P.2d 182].) Because actions for specific performance were not recognized at common law, the California Constitution does not guarantee the parties to such a proceeding a jury trial. (*Hastings* v. *Matlock* (1985) 171 Cal.App.3d 826, 835 [217 Cal.Rptr. 856].) Moreover, "[t]he fact that in an action for specific performance of an agreement the court must determine the existence of the agreement does not itself transform the action into one at law." (*Ibid.*; *Walton* v. *Walton* (1995) 31 Cal.App.4th 277, 288 [36 Cal.Rptr.2d 901].) Under these principles, plaintiffs are not constitutionally entitled to a jury trial on whether the arbitration agreements should be specifically enforced, including the question whether they are void for fraud.

The petition for an order of arbitration here was not a new, independent action; rather, it was filed in response to a complaint seeking, among other forms of relief, money damages, and was coupled with a request that litigation of the complaint be stayed pending completion of the arbitration. Plaintiffs therefore compare this case to those in which a plaintiff's release of liability is raised as a defense in an action for damages from personal injury. In such cases courts have held the issue of fraud in the inception or inducement of the release is for the jury in the underlying action. (*Palmquist* v. *Mercer* (1954) 43 Cal.2d 92, 100 [272 P.2d 26]; *Frusetta* v. *Hauben* (1990) 217 Cal.App.3d 551, 558-560 [266 Cal.Rptr. 62].) Neither of the cited decisions, however, considered any constitutional issue; the question was simply whether, under the particular facts of the case, the trial court properly removed an issue of fraud from the jury by an order for nonsuit (*Palmquist*) or summary judgment (*Frusetta*). Neither stands for the proposition the Legislature is constitutionally barred from establishing a nonjury procedure for deciding whether to order specific enforcement of a particular type of contractual agreement.

Plaintiffs also compare sections 1281.2 and 1290.2 to various statutes creating barriers to pleading specific causes of action or claims for damages. (E.g., Code Civ. Proc., §§ 425.13 [punitive damages against health care

provider], 425.14 [punitive damages against religious corporation], 425.16 ["SLAPP" (strategic lawsuits against public participation) suits], Civ. Code, § 1714.10 [action for civil conspiracy against attorney for conspiring with client to contest or compromise dispute].) This court and the Courts of Appeal, noting the potential deprivation of jury trial that might result were these statutes construed to require the plaintiff first to *prove* the specified claim to the trial court, have instead read the statutes as requiring the court to determine only if the plaintiff has stated and substantiated a legally sufficient claim. (See, e.g., *College Hospital, Inc.* v *Superior Court* (1994) 8 Cal.4th 704, 719 [34 Cal.Rptr.2d 898, 882 P.2d 894] [Code Civ. Proc., § 425.13]; *Lafayette Morehouse, Inc.* v. *Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 866-867 [44 Cal.Rptr.2d 46] [Code Civ. Proc., § 425.16]; *Hung* v. *Wang* (1992) 8 Cal.App.4th 908, 926-934 [11 Cal.Rptr.2d 113] [Civ. Code, § 1714.10].)

Plaintiffs' reliance on these decisions is misplaced. Under the cited statutes, the trial court is charged with making a preliminary determination as to the *merit* of the plaintiff's proposed cause of action or claim for punitive damages. In deciding an application to compel, in contrast, the superior court does not decide whether the plaintiff's causes of action have merit, although some factual questions considered in deciding the application may overlap those raised by the plaintiff's claims for relief. The only question implicated by the petition to compel arbitration is whether the arbitration agreements should be specifically enforced. As we have already seen, plaintiffs are not constitutionally entitled to a jury trial on that question. The plaintiff is not impermissibly denied a jury trial when the superior court decides only the facts necessary to determine specific enforceability of an arbitration agreement, an equitable question as to which no jury trial right exists.

In support of their claim the summary procedure of sections 1281.2 and 1290.2 deprives them of due process, plaintiffs assert the hearing and determination of a petition to compel "could take place early on in the proceedings, without the opportunity for discovery." Plaintiffs do not, however, assert they actually had insufficient time to conduct discovery before hearing of the petition, or that they sought and were refused discovery of any matter pertinent to the enforceability of the arbitration clause. Plaintiffs, of course, have full access to, and have made full use of, their own recollections of the transactions, the principal evidence upon which their claim of fraud in inception of the arbitration agreement is based. GWFSC has provided pertinent written evidence (the client agreements and other account forms), as well as declarations of its representatives, in support of its petition. These circumstances do not establish plaintiffs have been unfairly

denied discovery of anything they need to oppose the petition to compel arbitration.

We therefore conclude the summary procedure established by sections 1281.2 and 1290.2 does not violate the cited provisions of the California Constitution. A party opposing contractual arbitration of a dispute does not have the right to a jury trial of the existence or validity of the arbitration agreement. ■ Instead, when a petition to compel arbitration is filed and accompanied by prima facie evidence of a written agreement to arbitrate the controversy, the court itself must determine whether the agreement exists and, if any defense to its enforcement is raised, whether it is enforceable. Because the existence of the agreement is a statutory prerequisite to granting the petition, the petitioner bears the burden of proving its existence by a preponderance of the evidence. If the party opposing the petition raises a defense to enforcement—either fraud in the execution voiding the agreement, or a statutory defense of waiver or revocation (see § 1281.2, subds. (a), (b))—that party bears the burden of producing evidence of, and proving by a preponderance of the evidence, any fact necessary to the defense. (*Strauch* v. *Eyring, supra*, 30 Cal.App.4th at p. 186.)

Defendants urge us to hold a party opposing arbitration must show fraud not only by a preponderance of evidence, but by clear and convincing evidence. We are not persuaded such a rule does or should exist. Except as the law otherwise provides, the burden of proof is by a preponderance of the evidence. (Evid. Code, § 115.) Section 1281.2, which sets forth the bases for granting or denying an application to compel, neither states nor suggests any other burden of proof. We have, moreover, previously rejected the suggestion that allegations of fraud, in a civil action, must be proven by clear and convincing evidence. (*Liodas* v. *Sahadi* (1977) 19 Cal.3d 278, 286-291 [137 Cal.Rptr. 635, 562 P.2d 316].) Defendants' invocation of the general policy favoring enforcement of valid arbitration agreements is insufficient to warrant imposing a higher burden on a party opposing arbitration, especially when the existence and enforceability of the agreement to arbitrate is the very issue before the trial court.

## C. *Requirement of an Evidentiary Hearing*

We consider next the means to be used by the trial court in finding the facts relevant to enforcement of the arbitration agreement. As both parties acknowledge, hearing and determination "in the manner . . . provided by law for the . . . hearing of motions" (§ 1290.2) would ordinarily mean the facts are to be proven by affidavit or declaration and documentary evidence,

with oral testimony taken only in the court's discretion. (Code Civ. Proc., § 2009; Cal. Rules of Court, rules 303(a)(2), 323(a); *Strauch* v. *Eyring, supra,* 30 Cal.App.4th at p. 184; *Reifler* v. *Superior Court* (1974) 39 Cal.App.3d 479, 483-484 [114 Cal.Rptr. 356]; *Haldane* v. *Haldane* (1962) 210 Cal.App.2d 587, 593 [26 Cal.Rptr. 670].)

GWFSC nevertheless maintains that when the declarations and documentary evidence present a material factual dispute as to the existence or enforceability of the arbitration agreement, "the trial court must proceed to a summary bench trial" of the issues. In cases of this sort, GWFSC insists, "the failure to resolve a material issue of fact by an evidentiary hearing is an abuse of discretion." We decline to embrace the broad rule proposed by GWFSC. There is simply no authority for the proposition that a trial court necessarily abuses its discretion, in a motion proceeding, by resolving evidentiary conflicts without hearing live testimony. Nonetheless, we agree that where—as is common with allegations of fraud such as are made here—the enforceability of an arbitration clause may depend upon which of two sharply conflicting factual accounts is to be believed, the better course would normally be for the trial court to hear oral testimony and allow the parties the opportunity for cross-examination. As the trial court here remarked, "it's pretty difficult to weigh credibility without seeing the witnesses."

### D. *Correctness of the Procedures Followed Here*

The declarations presented by plaintiffs and GWFSC were in extensive and material conflict. The trial court, lacking adequate appellate guidance on the issue, was unsure whether its role was to "resolve these factual issues" or merely to determine "whether the evidence presented by the plaintiff has sufficient substantiality." As discussed above, the former course was the correct one under sections 1281.2 and 1290.2. The trial court, however, appears to have chosen the latter, denying the petition, as to all but one plaintiff, on the ground plaintiffs "presented sufficient evidentiary support for their allegations of fraud." To the extent, therefore, any plaintiff did produce legally sufficient evidence of fraud voiding the arbitration agreement, the trial court must determine the factual issues on remand. We turn next to the question whether any of the plaintiffs did produce such evidence.

### II. *Legal Sufficiency of the Plaintiffs' Declarations*

#### A. *Arbitrability of Fraud Claims Under Prima Paint*

GWFSC contends plaintiffs' declarations are legally insufficient to raise a nonarbitrable issue because their claims of fraud, even if believed, are not

directed specifically at the arbitration clauses. GWFSC relies on *Prima Paint v. Flood & Conklin* (1967) 388 U.S. 395, 404 [18 L.Ed.2d 1270, 1277-1278, 87 S.Ct. 1801] (*Prima Paint*), in which the high court held that under the USAA, unless the parties have agreed otherwise, "claims of fraud in the inducement of the contract generally," that is, fraud claims not going "to the 'making' of the agreement to arbitrate," are to be decided by the arbitrator rather than the court. We have interpreted section 1281.2 to embody the same standard of enforceability. (*Ericksen, Arbuthnot, McCarthy, Kearney, & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 322-323 [197 Cal.Rptr. 581, 673 P.2d 251] (*Ericksen*).)[8]

To consider GWFSC's *Prima Paint* argument, we must separate out the two fraud theories upon which plaintiffs have relied to avoid enforcement of the arbitration agreements: fraud in the *execution* of the client agreements, and fraud "*permeating*" the agreements.

■ California law distinguishes between fraud in the "execution" or "inception" of a contract and fraud in the "inducement" of a contract. In brief, in the former case " 'the fraud goes to the inception or execution of the agreement, so that the promisor is deceived as to the nature of his act, and actually does not know what he is signing, or does not intend to enter into a contract at all, mutual assent is lacking, and [the contract] is *void*. In such a case it may be disregarded without the necessity of rescission.' " (*Ford v. Shearson Lehman American Express, Inc.* (1986) 180 Cal.App.3d 1011, 1028 [225 Cal.Rptr. 895].) Fraud in the inducement, by contrast, occurs when " 'the promisor knows what he is signing but his consent is *induced* by fraud, mutual assent is present and a contract is formed, which, by reason of the fraud, is *voidable*. In order to escape from its obligations the aggrieved party must *rescind* . . . .' " (*Ibid.*)

■ GWFSC asserts *Prima Paint* mandates arbitration of any fraud claim, even one going to the execution of the contract, except an "independent" or "separate and distinct" challenge to the arbitration clause itself. Statements to that effect appear in some decisions applying *Prima Paint*. (See, e.g.,

[8]The *Prima Paint* court restricted its discussion to the standard to be applied in federal court. For that reason, and because the decision relies on language in section 4 of the USAA, rather than section 2 (see *Prima Paint, supra,* 388 U.S. at pp. 403-404 [18 L.Ed.2d at pp. 1277-1278]), one might question whether its rule applies in state courts even in transactions subject to the USAA. However, because the holding of *Prima Paint* is a substantive one limiting the circumstances under which arbitration clauses may be refused enforcement, it would appear to preempt contrary state law under the analysis of *Southland Corp., supra,* 465 U.S. at pages 10-16 [79 L.Ed.2d at pages 11-16], and would apply in both state and federal courts. In any event, as noted above, California follows the same rule.

*Rowland* v. *Paine Webber, Inc.* (1992) 4 Cal.App.4th 279, 285 [6 Cal.Rptr.2d 20] ["independent challenge"]; *Union Mutual Stock Life Ins.* v. *Beneficial Life.* (1st Cir. 1985) 774 F.2d 524, 529 [same]; see also *R. M. Perez & Associates, Inc.* v. *Welch* (5th Cir. 1992) 960 F.2d 534, 537-538 [holding "fraud in the factum," as well as in the inducement, subject to *Prima Paint*].)[9]

We do not believe, however, the language or logic of *Prima Paint* compels such a reading. To the contrary, we conclude claims of fraud in the execution of the entire agreement are not arbitrable under either state or federal law. If the entire contract is void *ab initio* because of fraud, the parties have not agreed to arbitrate any controversy; under that circumstance, *Prima Paint* does not require a court to order arbitration. (Accord, *Rice* v. *Dean Witter Reynolds, Inc.*, *supra*, 235 Cal.App.3d at p. 1024; *Strotz* v. *Dean Witter Reynolds, Inc.*, *supra*, 223 Cal.App.3d at pp. 217-218; *Three Valleys Mun. Water Dist.* v. *E.F. Hutton*, *supra*, 925 F.2d at pp. 1140-1141; *Cancanon* v. *Smith Barney, Harris, Upham & Co.* (11th Cir. 1986) 805 F.2d 998, 999-1000; see also *Rush* v. *Oppenheimer & Co., Inc.* (S.D.N.Y. 1988) 681 F.Supp. 1045, 1049 [allegations of fraud need not be directed "exclusively" at the arbitration clause].)

The central rationale of the high court's decision in *Prima Paint* was that arbitration clauses must, under federal law established in the USAA, be viewed as " 'separable' " from other portions of a contract (*Prima Paint*, *supra*, 388 U.S. at p. 402 [18 L.Ed.2d at pp. 1276-1277]); hence, fraud in the inducement relating to other contractual terms does not render the arbitration agreement unenforceable, even when it might justify rescission of the contract as a whole. By entering into the arbitration agreement, the parties established their intent that disputes coming within the agreement's scope be determined by an arbitrator rather than a court; this contractual intent must be respected even with regard to claims of fraud in the inducement of the contract generally.

Where, however, a party's apparent assent to a written contract is *negated* by fraud in the inception, there is simply no arbitration agreement to be enforced. As one Court of Appeal recently explained, *Prima Paint* does not require "allegations directed specifically and solely at the agreement to

---

[9]GWFSC also relies upon *Teledyne, Inc.* v. *Kone Corp.* (9th Cir. 1989) 892 F.2d 1404, 1410, in which the court referred to the need for a "separate and distinct" challenge to the arbitration clause. The court that decided *Teledyne*, however, has since explained that its decision rested on other grounds and does not apply when the party opposing arbitration "den[ies] the existence of the contracts containing the arbitration provisions." (*Three Valleys Mun. Water Dist.* v. *E.F. Hutton* (9th Cir. 1991) 925 F.2d 1136, 1142.)

arbitrate. *Prima Paint*, rather, requires some allegation [and, as we held earlier, evidence] from which it may be determined that the parties in fact did not intend to arbitrate the issues set forth in the pleadings. The allegation may be directed solely at the 'making' of the agreement to arbitrate or, as recognized by the doctrine of fraud in the inception, it may be directed at the 'making' of the contract as a whole." (*Hayes Children Leasing Co.* v. *NCR Corp.* (1995) 37 Cal.App.4th 775, 784 [43 Cal.Rptr.2d 650].)

In the absence of a contrary agreement, parties to a predispute arbitration agreement are presumed to have intended arbitration of controversies, including allegations of fraud in the inducement of the contract generally, that may allow rescission or reformation of the contract or part of it. They cannot, however, have intended arbitration under a contract wholly void for fraud in its execution. We therefore conclude *Prima Paint* does not preclude the court from deciding claims of fraud in the execution of the entire contract. The same is true of California law under our decision in *Ericksen*, *supra*, 35 Cal.3d 312, in which we explicitly distinguished cases where the party opposing arbitration " 'denied ever agreeing to anything.' " (*Id.* at p. 323, fn. 8.)

Although the question of fraud in the execution is for the trial court to decide, we reach a different conclusion on plaintiffs' second theory, fraud "permeating" the agreements. The "permeation doctrine" has developed in California courts as an ill-defined exception to the *Prima Paint* rule of arbitrability. (See *Strotz* v. *Dean Witter Reynolds, Inc.*, *supra*, 223 Cal.App.3d at pp. 212-217 (*Strotz*) [tracing origins of the doctrine and ultimately rejecting it as vague and potentially inconsistent with *Prima Paint*].) After examining various statements of the doctrine, we conclude it conflicts with *Prima Paint* and, thus, is not a ground for avoiding arbitration.

In *Main* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, *supra*, 67 Cal.App.3d at page 27 (*Main*), the court, having reviewed *Prima Paint* and several of its federal and state progeny, concluded, "where it is alleged that fraud either induced the arbitration clause itself, *or permeated the entire agreement including the arbitration clause*, that issue will be determined judicially and not by arbitration." (Italics added.) The court then found the plaintiff's allegations sufficient to show constructive fraud, in that "defendants gained an advantage over plaintiff by inclusion, in the lending agreement, of the provision to arbitrate." (*Id.* at p. 31; but see *Strotz*, *supra*, 223 Cal.App.3d at p. 216 [persuasively criticizing *Main*'s conclusion on the last point].)

In *Ericksen*, *supra*, 35 Cal.3d at page 323, footnote 8, this court mentioned *Main*'s analysis briefly, but with apparent approval. In doing so, however,

we apparently understood the "permeation doctrine" to be identical or very similar to fraud in the inception or execution of a contract: we held it inapplicable because " 'this is not a case . . . where the defendant denied ever agreeing to anything.' " (*Ibid.*; see also *Hayes Children Leasing Co.* v. *NCR Corp.*, *supra*, 37 Cal.App.4th at p. 784 [*Ericksen* treated permeation as "identical to the doctrine of fraud in the inception"]; *Herman Feil, Inc.* v. *Design Center of Los Angeles* (1988) 204 Cal.App.3d 1406, 1416 [251 Cal.Rptr. 895] ["As was observed in *Ericksen*, however, the 'permeation' claim is applicable only where the party seeking to avoid arbitration denies having agreed to *anything*."].)

The permeation doctrine received its broadest application in *Ford* v. *Shearson Lehman American Express, Inc.*, *supra*, 180 Cal.App.3d at pages 1019-1028 (*Ford*). The court there interpreted *Prima Paint* as requiring arbitration only when the fraud claim "goes to the performance under a contract"; claims of fraud going to the "making or procurement" of a contract are to be decided by the trial court. (*Id.* at p. 1022.) In the case before it, the court concluded, arbitration could be avoided on a theory of fraud permeating the contract because the plaintiff had alleged "a grand scheme of fraud which permeated the entire relationship and transactions perpetrated by all defendants." (*Id.* at p. 1027.) Thus, the plaintiff sufficiently alleged "the fraud practiced on him pertained to the 'making' of the agreements containing the arbitration clause." (*Id.* at p. 1023.)

As another Court of Appeal has since explained, the *Ford* court appears to have "ignore[d] the rule in *Prima Paint* that the arbitration agreement is severable from the principal contract. [¶] The Supreme Court in *Prima Paint* did not hold that fraud which goes to the making of the contract is for the court and fraud related to the performance of the contract is for the arbitrator. Rather, the court specifically and expressly made a distinction between fraud which is directed at the arbitration agreement and fraud directed at the principal contract. The court quite clearly held that only fraud directed at the making or performance of the arbitration agreement is to be determined by the court. (*Prima Paint Corp.* v. *Flood & Conklin*, *supra*, 388 U.S. 395, 403-404 [18 L.Ed.2 1270, 1277-1278].)" (*Strotz*, *supra*, 223 Cal.App.3d at p. 217.)

Thus, the permeation doctrine conflicts with *Prima Paint* "to the extent it indicates that an agreement to arbitrate may be found invalid simply because the contract as a whole was induced by fraud." (*Hayes Children Leasing Co.* v. *NCR Corp.*, *supra*, 37 Cal.App.4th at p. 784.) To the extent, on the other hand, the permeation doctrine is merely another name for fraud in the

execution of a contract, it is unnecessary. Seeing, therefore, no legally valid use for the theory, we decline further to recognize it. Claims that a party has employed fraud in inducing consent specifically to the arbitration agreement (e.g., by actively concealing its existence or misrepresenting its meaning or value) are, under *Prima Paint*, to be decided by the court, because they go to the validity of the making of the arbitration clause itself. Claims that, due to fraud in the execution of the agreement as a whole, the parties reached no contract containing an arbitration clause, are also to be decided by the court. But claims that the contract as a whole was obtained through fraud in the inducement are, in the absence of evidence of the parties' contrary intent, arbitrable under *Prima Paint*. Included in this rule of arbitrability are claims of a "grand scheme" of fraud, or fraud "permeating" the transaction.

### B. *Reasonableness of Reliance as an Element of Fraud in the Inception*

The parties dispute whether plaintiffs' declarations, even if believed, show fraud in the inception or execution of the client agreements sufficient to render the agreements entirely void. In assessing the legal sufficiency of plaintiffs' claims, we apply the California law of contracts generally, rather than any rules uniquely tailored to enforcement of arbitration agreements. We are precluded under section 2 of the USAA from "singling out arbitration provisions for suspect status." (*Doctor's Associates, Inc.* v. *Casarotto*, *supra*, 517 U.S. __, __ [134 L.Ed.2d 902, 909, 116 S.Ct. 1652, 1656].)[10]

The central disputed question is whether plaintiffs could justifiably rely on GWFSC's misrepresentations without themselves ascertaining the nature of the documents they signed. GWFSC argues plaintiffs had a reasonable opportunity to know the terms of the client agreements, but failed through their own neglect to read them. Plaintiffs, however, claim their failure to read the client agreements is legally excused by virtue of GWFSC's asserted fraud. They rely on *Lynch* v. *Cruttenden & Co.* (1993) 18 Cal.App.4th 802, 807 [22 Cal.Rptr.2d 636] (*Lynch*), in which the court stated, "The general rule in California is that even in the absence of a fiduciary relationship plaintiff's failure to read a contract is excusable where reliance is placed on the misrepresentations of the other party." (Accord, *Strotz*, *supra*, 223 Cal.App.3d at pp. 218-219.)

California law supports GWFSC's position that fraud does not render a written contract *void* where the defrauded party had a reasonable opportunity

---

[10]Our reference to the federal rule embodied in the USAA, which governs this case, should not be taken to suggest California law is any different. Like section 2 of the USAA, Code of Civil Procedure section 1281 mandates the enforcement of arbitration agreements not be denied except on grounds applicable to "any contract."

to discover the real terms of the contract. A contract may, however, be held wholly void, despite the parties' apparent assent to it, when, " '*without negligence on his part*, a signer attaches his signature to a paper assuming it to be a paper of a different character.' " (*C. I. T. Corporation* v. *Panac, supra,* 25 Cal.2d at p. 549, quoting 1Williston on Contracts (3d ed.1957) § 95A, pp. 350, 351, italics added; see also *Gardner* v. *Rubin* (1957) 149 Cal.App.2d 368, 372 [308 P.2d 892] [negotiable instrument not enforceable even by holder in due course where executed through fraud and *"in the absence of negligence on the part of the maker"* (italics added)]; *Ramirez* v. *Superior Court* (1980) 103 Cal.App.3d 746, 756, fn. 3 [163 Cal.Rptr. 223] ["no agreement exists unless the parties signing the document act voluntarily and are aware of the nature of the document and have turned their attention to its provisions *or reasonably should have turned their attention to its provisions*" (italics added)].) A release of a liability claim, for example, "may be rendered void on the grounds of fraud or misrepresentation regarding the nature of the claim covered by the release *so long as the releasor's failure to learn the nature of the terms was not attributable to his own negligence.*" (*Frusetta* v. *Hauben, supra,* 217 Cal.App.3d at p. 557, italics added; see also *Casey* v. *Proctor* (1963) 59 Cal.2d 97, 103 [28 Cal.Rptr. 307, 378 P.2d 579] [release not binding if releaser's misapprehension of nature or scope caused by other party's misconduct and *"not due to his own neglect"* (italics added)].)

The Restatement position is similar. Restatement Second of Contracts section 163, titled "When a Misrepresentation Prevents Formation of a Contract," states as follows (italics added): "If a misrepresentation as to the character or essential terms of a proposed contract induces conduct that appears to be a manifestation of assent *by one who neither knows nor has a reasonable opportunity to know* of the character or essential terms of the proposed contract, his conduct is not effective as a manifestation of assent." As the official comment explains, the misrepresentation in such a case "goes to what is sometimes called the 'factum' or the 'execution' rather than merely the 'inducement'," and renders the contract "void" rather than merely "voidable." (Rest.2d Contracts, § 163, coms. a & c, pp. 443, 444.)

The *Lynch* and *Strotz* courts relied for their contrary statements of the law on 1 Witkin, Summary of California Law (9th ed. 1987) Contracts, section 407, pages 366-367. In that section Witkin asserts that, while misrepresentations were once regarded as an excuse for failure to read a contract only within a fiduciary relationship, "[i]t is now settled . . . that the excuse may be asserted even in the situation where the parties are in no such relationship." (*Id.* at p. 366.) Upon examination of the authorities, we conclude

Witkin and the courts in *Lynch* and *Strotz* state the rule of excuse too broadly. While some prior cases have held equitable relief, such as rescission or reformation of the contract, may be available despite the defrauded party's failure to read the contract, our law is clear that misrepresentation does not render the contract *void* unless the misled party, before making the agreement, lacked a reasonable opportunity to learn its terms.

Aside from a case stating a special rule for insurance policies, Witkin relies principally on two decisions of this court: *California Trust Co.* v. *Cohn* (1932) 214 Cal. 619 [7 P.2d 297] (*Cohn*) and *Van Meter* v. *Bent Construction Co.* (1956) 46 Cal.2d 588 [297 P.2d 644] (*Van Meter*). (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 407, pp. 366-367.) Both cases, however, involve reformation of contracts, rather than the determination a contract is void for fraud in the execution.

In *Cohn*, the cross-complainants alleged the cross-defendant had made an oral agreement to hold certain real property in trust for the cross-complainants, to sell the property to third parties, and to pay cross-complainants part of the proceeds. Cross-defendant had then prepared and, by misrepresenting the writing's contents, induced cross-complainants to sign a written agreement under which cross-complainants were obliged to purchase the property themselves. Cross-complainants sought reformation of the written contract to reflect the terms of the oral agreement. (*Cohn, supra,* 214 Cal. at pp. 622-624.) This court held the alleged facts sufficient "to warrant a reformation of the written contract," despite cross-complainants' admitted failure to read the written agreement before signing it. (*Id.* at p. 626.) We noted "[t]here has always been a sharp struggle in the courts between the desire to repress fraud upon the one hand, and on the other to discourage negligence and the opportunity and invitation to commit perjury." (*Id.* at p. 627.) We concluded that "where the failure to familiarize one's self with the contents of a written contract prior to its execution is traceable solely to carelessness or negligence, *reformation* as a rule should be denied; but that where such failure, and perhaps negligence, is induced, as alleged and admitted by the demurrer in this case, by the false representations and fraud of the other party to the contract that its provisions are different from those set out, the courts, even in the absence of a fiduciary or confidential relationship between the parties, *should reform, and in most cases have reformed,* the instrument so as to cause it to speak the true agreement of the parties." (*Ibid.,* italics added.)

Thus, in *Cohn*, this court allowed equitable relief for fraud, through reformation of the written contract, despite a party's failure to read the

writing. We did not hold a party who had reasonable opportunity to learn the terms of a contract before executing it but failed to do so, could, because of another party's misrepresentations, obtain a judgment the contract was completely void for lack of assent.

*Van Meter* involved a subcontractor's negligent failure to ascertain that the area of land to be cleared was greater than represented by the general contractor. As in *Cohn*, the plaintiff sought reformation of the contract rather than a declaration it had never been entered into. (*Van Meter, supra*, 46 Cal.2d at pp. 590, 593.) This court held the subcontractor's negligence did not bar it from obtaining relief. We noted that since the general contractor had believed true its statements regarding the area to be cleared, the contract might be reformable or rescindable under a theory of mutual mistake. (*Id.* at p. 594.) In addition, we relied on the principle that a defendant who had misrepresented the facts should not generally be heard, in an action for "equitable relief," to assert the plaintiff's reliance on his misrepresentations was negligent, at least in the absence of facts making the plaintiff's conduct "preposterous or irrational." (*Id.* at p. 595.) *Van Meter*, like *Cohn*, thus concerns only the propriety of equitable relief, and does not speak to the facts necessary to show a party's apparent assent is ineffective because of fraud in the execution of the contract.

Witkin also cites a section of the Restatement as treating the same subject, i.e., negligence of the defrauded party. (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 407, p. 367.) Notably, however, the section cited is section 172, which deals only with fraud as grounds for avoidance or reformation of a contract (Rest.2d Contracts, § 172 & com. a, p. 469), rather than section 163, which, as discussed earlier, concerns fraud negating assent to a contract and thereby rendering it void. Section 172 provides that a defrauded party's "fault in not knowing or discovering the facts before making the contract does not make his reliance unjustified unless it amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing." Comment *a* to the section explains it as an elaboration of the rule that "[t]he recipient's reliance on the misrepresentation must be justified in order to entitle him to avoidance (§ 164)[11] or reformation (§ 166)." (Rest.2d Contracts, § 172, com. a, p. 469.) When the defrauded party seeks such equitable relief, relief will not be barred by "the mere fact that he could, by the exercise of reasonable care, have avoided the mistake." (*Ibid.*)

---

[11]Restatement Second of Contracts section 164 delineates, inter alia, the circumstances under which a contract is "voidable" because one party's assent was induced by the other's fraudulent misrepresentation. (Rest.2d Contracts, § 164, com. a, pp. 445-446.) It describes, in other words, fraud in the inducement, which allows the defrauded party to avoid the contract by rescinding it. (See 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 403, p. 363.)

As the comment further explains, however, such negligence *does* bar the defrauded party from claiming the contract is void for lack of assent: "However, the recipient's fault will prevent application of the rule stated in § 163, under which a misapprehension as to the very nature of a proposed contract makes his apparent manifestation of assent ineffective. That rule applies only if he has neither knowledge nor reasonable opportunity to obtain knowledge of the character or essential terms of the proposed contract." (*Ibid.*) The same contrast between the standards for equitable relief and a finding of voidness is made in comment *b* to section 163. (Rest.2d Contracts, § 163, com. b, p. 444; see also *id.*, § 164, com. a, p. 445.)

■ We therefore conclude that, whatever validity the rule stated in *Lynch*, *Strotz* and Witkin may have when the plaintiff seeks equitable relief for fraud in the inducement of a contract, and whatever the exact parameters of that rule might be, the rule is not a correct statement of the test to be applied when the plaintiff seeks a judicial determination the contract is void for fraud in the execution. In the latter case, California law, like the Restatement, requires that the plaintiff, in failing to acquaint himself or herself with the contents of a written agreement before signing it, not have acted in an objectively unreasonable manner. One party's misrepresentations as to the nature or character of the writing do not negate the other party's apparent manifestation of assent, if the second party had "reasonable opportunity to know of the character or essential terms of the proposed contract." (Rest.2d Contracts, § 163, p. 443.) If a party, with such reasonable opportunity, fails to learn the nature of the document he or she signs, such "negligence" precludes a finding the contract is void for fraud in the execution. (*C. I. T. Corporation* v. *Panac, supra*, 25 Cal.2d at p. 549.)

■ It follows that one party's *unreasonable* reliance on the other's misrepresentations, resulting in a failure to read a written agreement before signing it, is an insufficient basis, under the doctrine of fraud in the execution, for permitting that party to avoid an arbitration agreement contained in the contract. Whether a fraud claim that is insufficient as a defense to an arbitration demand may, if proven, nonetheless form the basis for equitable or other relief in the arbitral forum, is a separate issue, with which we have no concern in this case.

C. *Sufficiency of Plaintiffs' Showings of Fraud in the Execution*

It remains only to apply the foregoing test to the facts shown by the plaintiffs' declarations. We first examine the evidence common to most or all plaintiffs. ■ Many plaintiffs in the instant case declare GWFSC

representatives told them the written client agreements were unimportant, or that plaintiffs need not read them. (See, e.g., declarations of Allen [" 'it's not necessary to read them' "]; Fitzgerald ["documents just restated what he had already told me"]; George Lampel ["documents were necessary for us to open our account" but were "merely standard forms" and "just repeated what he told us"]; Pupo [" 'just a formality for opening your account' "]; Rosenthal ["just a formality and they just restated what he had already told me"]; and Warren ["not necessary to read the form"].) Such statements, even if falsely and fraudulently made, do not void a written contract, because it is generally unreasonable, in reliance on such assurances, to neglect to read a written agreement before signing it. One party's making of such an assurance does not, by itself, deprive the other party to a prospective contract of the reasonable opportunity to discover the character and essential terms of the agreement.[12]

Many plaintiffs also declare they were longtime depositors with GWB before they invested in mutual funds with GWFSC, and were led to believe the GWFSC representative worked for GWB. Plaintiffs generally contend, and some expressly declare, that for these reasons they placed their trust in the GWFSC representatives and relied upon the representatives' assurances they did not need to read the contract.

Floyd Allen, for example, declares he had banked at the same GWB branch for 30 years and believed the woman who sold him the funds to be an employee of GWB, "since her desk was near the tellers [one of whom referred Allen to her] and was in the same room as the other bank operations." Betty Connolly banked at the same GWB branch for more than 25 years. A GWFSC representative called her from the GWB branch to discuss her GWB certificate of deposit, which was expiring. Because he had information regarding her GWB account, and because his desk was in the branch along with other banking operations desks, she thought he was a GWB employee. She signed the client agreement without reading it, because "I trusted Great Western and its employees and he [the representative] had said that the forms just repeated what he had told me . . . ." Ruby Rosenthal, 94 years old, had banked at GWB for about 30 years. She thought the GWFSC representative worked for GWB because he worked in the same area as GWB staff, and had her telephone number and access to her bank records. She relied on the representative, signing the client agreement without reading it. Other plaintiffs make similar declarations.

---

[12]Some plaintiffs also declare that the GWFSC representative "did not give me any time" to read the agreement (Allen), or that they felt "rushed" (Carcano) or "pressured" (Rosenthal). Without evidence the representative actually took some action or said something to hurry or pressure the prospective client, however, these claims add nothing to plaintiffs' showing.

Plaintiffs' long-term relationship with GWB and their belief the GWFSC representatives actually represented GWB do, to some degree, explain their asserted reliance on the representatives' assurances they need not read the client agreements. We do not believe, however, these facts are so compelling as to make reasonable plaintiffs' complete reliance on the representatives. To make out a claim of fraud in the execution, it must be remembered, plaintiffs must show their apparent assent to the contracts—their signatures on the client agreements—is negated by fraud so fundamental that they were deceived as to the basic character of the documents they signed and had no reasonable opportunity to learn the truth. By their claim of fraud in the execution, plaintiffs do not seek equitable relief in the form of rescission or reformation, or damages for being misled, but, rather, a judicial determination they never assented to any contract. Because the facts described above do not establish these plaintiffs lacked a reasonable opportunity to learn the character of the documents they signed, they do not prove fraud sufficient to make the contracts wholly void.

Plaintiffs also contend GWFSC and its representatives owed them a fiduciary duty and breached that duty by failing accurately to explain to plaintiffs the terms of the agreement. The existence of a fiduciary relationship, plaintiffs further contend, excuses their failure to read the client agreements before signing them. GWFSC argues that a stockbroker's fiduciary duty to the customer does not include the giving of legal advice, such as the explanation of contractual terms.

Granting the existence of a fiduciary relationship between securities brokers and their customers, the scope of the duty varies with the facts of the relationship. (See *Duffy* v. *Cavalier* (1989) 215 Cal.App.3d 1517, 1535 [264 Cal.Rptr. 740] ["The question is not whether there is a fiduciary duty, which there is in every broker-customer relationship; rather, it is the *scope or extent* of the fiduciary obligation, which depends on the facts of the case."].) Plaintiffs, according to their declarations, were given reason to believe the GWFSC representatives worked for GWB, an institution with which they had long acquaintance, and therefore might reasonably have regarded the representatives as generally trustworthy. Nonetheless, they had no ongoing relationship with GWFSC or its representatives. At the times the claimed nondisclosures occurred, no agency relationship had yet been formed, and those aspects of a broker's duty that derive from his or her role as the investor's agent are therefore not applicable. Under these circumstances, we find no authority for the proposition the fiduciary obligations of a broker extend to orally alerting the customer to the existence of an arbitration clause or explaining its meaning and effect. (See *Gouger* v. *Bear, Stearns &*

*Co., Inc.* (E.D.Pa. 1993) 823 F.Supp. 282, 286-288; *Castro* v. *Marine Midland Bank, N.A.* (S.D.N.Y. 1988) 695 F.Supp. 1548, 1551; *Rush* v. *Oppenheimer & Co., Inc., supra*, 681 F.Supp. at p. 1052.) As to other terms of the agreement, such as the risks and benefits of the investments, the question of a breach of fiduciary obligations is a separate matter—in this case for the arbitrators—which we do not address.

It should be stressed that plaintiffs' declarations do not establish any actual *concealment* by GWFSC of the arbitration clause, or any affirmative misrepresentations regarding the existence or meaning of an arbitration clause in the client agreements. The client agreement is a one-page (legal size) document; the arbitration agreement is in bold print in the center of the page's right column of text. It includes a brief explanation of the meaning of arbitration, including the important facts that arbitration is final and binding, that parties to arbitration waive their right to jury trial, and that judicial review of the award is "strictly limited." Immediately above the signature line, moreover, is a bold-print reminder that "this agreement contains a predispute arbitration clause above in paragraphs 9 and 10." Under these circumstances, plaintiffs understandably rest on their complete failure to read the agreements, which failure they argue was excused by GWFSC's fraudulent misrepresentations as to the nature of the documents, rather than on any specific claims of concealment or misrepresentation as to the arbitration clauses themselves. As we have already concluded, however, the relationship between plaintiffs and GWFSC representatives was insufficient to make reasonable plaintiffs' reliance on the representatives' assurances they need not read the agreements.[13]

We conclude that the statements of GWFSC representatives to the effect the client agreements were merely a formality, or did not need to be read, were insufficient, even in light of the parties' relationship, to warrant a finding of fraud in the inception of the agreements. As to those plaintiffs

---

[13]Plaintiffs' brief leaves unclear whether the existence of a fiduciary duty is intended to show fraud in the execution, fraud in the inducement "permeating" the contract, or both. As we concluded earlier, only the former theory is, under *Prima Paint*, a viable theory for opposing arbitration. In the discussion immediately above, we hold the circumstances of the described relationships insufficient to justify plaintiffs' failure to read the contracts, and hence insufficient to show constructive fraud in the execution. To the extent plaintiffs also intend the asserted fiduciary relationship to serve as the premise for a showing of constructive fraud in the inducement, *aimed specifically at the arbitration clauses*, the showing fails because any duty on the representatives' part, in the circumstances, did not extend to drawing plaintiffs' attention to, or explaining the meaning of, the arbitration clauses.

whose declarations disclose no additional evidence of fraud, the petition to compel should have been granted.[14] The remaining plaintiffs' declarations require individual discussion.

 Plaintiff Giovanna Greco declares she is an 81-year-old Italian immigrant, who speaks "only a few words of English" and "cannot read English at all." (Her signed declaration is in Italian, with an unsigned English translation provided.) Greco's daughter, plaintiff Rosalba Kasbarian, describes herself as a 45-year-old Italian immigrant, who is able "to speak and understand simple English," but "cannot read English very well at all," and has difficulty reading "complicated words or legal terms." (Kasbarian's signed declaration is in English.) Greco and Kasbarian were depositors of GWB.

Kasbarian received a telephone call from a man named Dominick, who said he was with "Great Western" and could help Kasbarian and Greco obtain a higher return than they were getting on their certificates of deposit. Kasbarian and Greco met with Dominick—apparently Dominick Divine, a GWFSC representative—who they thought worked for GWB. Divine described a safe investment with a high return, and they agreed to deposit money in it. According to Greco, she told Divine she could not understand a lot of what he was saying because her English was so poor. "He then took out some papers, which he held in his hand and said that he would read them for us and that Rosalba should translate for me. She translated for me what he was saying as he glanced over the documents." He again described the investment as having no risk of loss of principal and as " 'not at all like stocks.' " Divine "never mentioned the word 'arbitration' or that I was giving up any of my legal rights." Greco did not understand she was investing in a mutual fund or that she was agreeing to waive her "legal rights" in case of a dispute.

Greco continues, "After describing what the documents supposedly said, he said, 'you just need to sign this to open the account.' He explained that the documents he wanted me to sign 'just repeat what I told you and your sister [*sic*].' Because I trusted him to have correctly described the documents to me, I signed them where he pointed for me to sign." Several months later, according to Greco, she and Kasbarian returned to the branch to "deposit" more money in their new "account," and met with a different representative, Nina Daikovich. Daikovich, like Divine, purported to describe the investment accurately for them, but did not mention arbitration and urged them to

---

[14]The plaintiffs referred to are Floyd Allen, Michael Carcano, Betty Connolly, Almada Didio, Thomas Fitzpatrick, George and Veronica Lampel, Pearl Mitchell, Alfred Nabeta, Norma and Noel Resnick, Ruby Rosenthal, Birdie Vaughn, and Phillip Warren.

" 'just sign here.' " Kasbarian's narration of the interactions with Divine and Daikovich is consistent with Greco's.

Greco and Kasbarian's declarations, if believed (and interpreted, where ambiguous or self-contradictory, in plaintiffs' favor), would establish facts sufficient to show reasonable reliance as an element of fraud in the execution of the client agreements. In light of plaintiffs' prior relationship with GWB, which they were led to believe was also the employer of Divine and Daikovich, their limited ability to understand English, and Divine and Daikovich's representations that their oral recitals accurately reflected the terms of the agreements, plaintiffs would not have been negligent in relying on the GWFSC representatives instead of reading the agreements themselves. (See *C. I. T. Corporation* v. *Panac*, *supra*, 25 Cal.2d at pp. 553-560 [plaintiffs' functional illiteracy in English, together with other party's misrepresentations regarding the character of the written contract, incomplete oral reading of the agreement, and urgings that plaintiffs sign it without reading it themselves or obtaining independent advice, held sufficient to support finding of fraud in the inception].) Under these circumstances, we conclude, the alleged fraud of GWFSC's representatives, if true, would have deprived Greco and Kasbarian of a reasonable opportunity to learn the character and essential terms of the documents they signed. (Rest.2d Contracts, § 163, p. 443.)

The facts in Greco and Kasbarian's declarations, however, are far from undisputed. Divine and Daikovich both submitted responsive declarations contradicting plaintiffs on several critical points, including plaintiffs' English language abilities, the representatives' failure accurately to explain the investments, and the representatives' assurances plaintiffs did not need to read the client agreement. Indeed, Daikovich denies she opened an account for Greco and Kasbarian; instead, she states she opened an account for Greco and her son, Rosario Greco. Daikovich's version is supported in this respect with a copy of a client agreement signed by Greco and Rosario Greco, but not by Kasbarian. An earlier agreement is signed by Greco and Kasbarian. In addition, plaintiffs' declarations are in some respects vague, ambiguous and internally inconsistent. These factual issues are to be resolved by the trial court, as described earlier in this opinion.

 Plaintiff Jodie Anne Rosen, 30 years old, is legally blind as a result of a 1989 industrial injury. She initially placed her workers' compensation settlement of $125,000 in a short-term GWB certificate of deposit. She chose GWB, where she herself had banked for "several years," because "my family had banked with Great Western for decades." Shortly thereafter, a GWB

employee referred her to Carlos Ferlini, a GWFSC representative, whom the employee described as "Great Western's Investment Counselor." Because she recognized Ferlini as a former GWB teller, because Ferlini had access to her account, and because Ferlini's desk was right next to the loan department, she "never doubted" he was a GWB employee.

At the outset of her meeting with Ferlini, Rosen told him she was legally blind "so that he would know that he would have to explain things to me and not rely on my being able to read documents." Ferlini told her he had a safe, "'government secured'" investment for her that would earn 12.5 percent interest. He never told her she was investing in a mutual fund, nor did he mention the arbitration clause or tell her she was waiving her "legal right" in case of a dispute. After she agreed to invest $110,000 of her settlement money in this "'Sierra Fund,'" Rosen declares, the following occurred: "Mr. Ferlini took out some documents and told me to sign them to open the new account. I told him that I could not read print that small. . . . Mr. Ferlini explained, 'These documents just repeat what I have told you. You just need to sign by the "Xs."' I told him I could not even see the 'Xs' to know where to sign. He then said, 'Okay, just sign where my finger is' and he then pointed to several places where I was supposed to sign. My sister, Sundae Rosen, who had come over to the table in the middle of my discussion with Mr. Ferlini, asked what I was signing. Mr. Ferlini said, 'It is just a signature card.' [¶] I trusted Mr. Ferlini and thought that I was signing a signature card and some form documents to open an account."

Rosen's signed declaration is followed by an attestation from her sister Sundae that Sundae accurately read Rosen the declaration before Rosen signed it.

Rosen's declaration, if believed and interpreted in her favor, shows facts that would suffice to establish reasonable reliance for purposes of showing fraud in the execution of the agreement. In light of Rosen's prior relationship with GWB, by whom she reasonably thought Ferlini was employed, her warnings to Ferlini that she could not read the documents, Ferlini's assurances they only repeated what he had told her, and his assurance that Rosen was only signing a "signature card," Rosen's failure to take additional steps to learn the contents of the written agreement would not have been negligent. GWFSC's asserted fraud would have deprived her of a reasonable opportunity to learn the character and essential terms of the documents she signed.

Rosen's declaration is contradicted by evidence submitted by GWFSC. Although Ferlini did not provide a declaration, GWFSC representative Bret

Davidson declares it was he, not Ferlini, who initially met with Rosen. Davidson then introduced Rosen and her sister to Ferlini, who gave them "a full presentation." Finally, Davidson filled out the paperwork, reviewed it with her, and obtained her signature. According to Davidson, Rosen never said or demonstrated she was visually impaired. She signed the client agreement and other documents without his aid and without saying she could not read them. The trial court, as discussed above, must resolve these testimonial conflicts.

Plaintiff Dorothy Bied did not submit a declaration. However, her daughter and guardian ad litem, Cecile Talsky, declares that Bied, 80 years old, is suffering from Alzheimer's disease. As a result, she has "severe memory loss, diminished understanding and is incapable of understanding complicated monetary transactions." According to Talsky, Bied has banked with GWB for 30 years. After learning Bied had, in January 1994, transferred some of her savings to a "Sierra Fund," Talsky informed "Great Western's branch office" that her mother had Alzheimer's disease and should not be permitted to transfer money from certificates of deposit to mutual funds. In October 1994, however, Talsky discovered her mother had agreed to transfer additional savings into the mutual fund. Talsky telephoned GWFSC representative Joseph Duncan and told him to cancel the investment. She told Duncan her mother had Alzheimer's, could not understand the investments, and had, in May 1994, given her and her brother a power of attorney. Although Duncan assured her he would cancel the transaction, he did not.

Talsky's declaration provides no evidence any GWFSC representative made any fraudulent statement to Bied in the course of securing her apparent assent to the investments. It is possible, however, that Bied, in light of her asserted disability, can establish constructive fraud in GWFSC's abuse of a confidential or fiduciary relationship. (Civ. Code, § 1573; 1 Witkin, Summary of Cal. Law, *supra*, Contracts, §§ 400-401, pp. 360-362.) The parties have not specifically briefed this point with regard to Bied, and the facts of her case are so unclear and in such dispute that legal analysis of the question would be premature.[15] In any event, Talsky's declaration, if believed, raises a factual issue as to Bied's capacity to contract; if extreme enough, her mental deficiency could render void any contract to which she apparently

---

[15]Declarations of GWFSC representatives, and accompanying documents, would, if believed, establish: (1) that the GWFSC account opened in January 1994 was opened *jointly* by Bied, *Talsky*, and Talsky's brother, Neal Rayburn; (2) that the October 1994 transaction was not an additional investment of Bied's savings in mutual funds but a *sale* of mutual fund shares at Bied's request and the reinvestment of those moneys in an annuity; and (3) that the October 1994 transaction was canceled at Talsky's request in December 1994 and the money returned to Bied.

assented, including client agreements containing the arbitration clause. (See 1 Witkin, *supra*, § 358, p. 326.) On remand, the trial court must find the facts and decide whether they render the contract void under either theory.

Two other plaintiffs, Raul Pupo and Felix Segarra, produced evidence of limited facility with English, but have not shown facts sufficient to make their complete reliance on GWFSC's representatives reasonable. Unlike Greco and Kasbarian, neither Pupo nor Segarra presents evidence the representative purported to read the contract to them or to explain its full contents orally. Unlike Rosen, they present no evidence they told the representative they could not read the contracts, a fact that in Rosen's case made more reasonable her reliance on the subsequent misrepresentations. As far as appears from his declaration, moreover, Pupo had no prior relationship with GWFSC, GWB or the representative. Under these circumstances, Pupo and Segarra's failure to take measures to learn the contents of the document they signed is attributable to their own negligence, rather than to fraud on the part of GWFSC or its representatives.

## DISPOSITION

The judgment of the Court of Appeal is affirmed insofar as it reversed the order denying GWFSC's petition to compel arbitration. The judgment is reversed insofar as it directed the trial court to conduct jury trials on plaintiffs' claims of fraud in the inception. The cause is remanded to the Court of Appeal with instructions to direct further proceedings in the trial court consistent with our opinion.

George, C. J., Mosk, J., Baxter, J., Chin, J., and Brown, J., concurred.

**KENNARD, J., Concurring.**—I join in the majority's opinion. It decides that, for most of the plaintiffs, their claims that the arbitration clause is unenforceable because of fraud should now proceed to arbitration. I write separately to explain the procedure that should occur when those claims are presented to the arbitrator.

As explained by the majority, claims that an arbitration clause is unenforceable because of fraud are to be decided by the court if the fraud would render the entire contract void or if the fraud was specifically directed at the arbitration clause. Thus, claims of fraud in the execution of the entire contract (because they would show the contract to be void) and claims of fraud in the execution or the inducement of the arbitration clause itself (because they are directed at the arbitration clause), must be decided by the court in the first instance before it can compel arbitration. (*Prima Paint* v.

*Flood & Conklin* (1967) 388 U.S. 395, 403-404 [18 L.Ed.2d 1270, 1277-1278, 87 S.Ct. 1801]; *Hayes Children Leasing Co.* v. *NCR Corp.* (1995) 37 Cal.App.4th 775, 783-784 [43 Cal.Rptr.2d 650].) By contrast, a claim that a contract containing an arbitration clause is unenforceable because of fraud in the inducement of the contract as a whole is for the arbitrator and not the court to decide (because such a fraud would make the contract voidable but not void). (*Prima Paint* v. *Flood & Conklin, supra,* 388 U.S. 395, 403-404 [18 L.Ed.2d 1270, 1277-1278]; *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc.* v. *100 Oak Street* (1983) 35 Cal.3d 312, 323-324 [197 Cal.Rptr. 581, 673 P.2d 251].)

In this case, plaintiffs claim that the arbitration clause is unenforceable because defendants fraudulently misrepresented the contract's written terms. This type of claim can be either for the court or the arbitrator depending on whether the party objecting to arbitration presents evidence that it lacked a reasonable opportunity to learn of the written terms, and therefore reasonably relied on the other party's misrepresentations. If the party lacked a reasonable opportunity to learn of the contract's written terms, then the contract may be void, making the issue of fraud one for the court. (See maj. opn., *ante,* at pp. 419-420 and authorities cited thereat.) If the party had a reasonable opportunity to learn the terms of the contract but did not, then the contract is subject to reformation or other equitable relief although it is not void (*California Trust Co.* v. *Cohn* (1932) 214 Cal. 619, 627 [7 P.2d 297]; *Van Meter* v. *Bent Construction Co.* (1956) 46 Cal.2d 588, 593-595 [297 P.2d 644]; Rest.2d Contracts, §§ 166, 172 & com. a, pp. 450, 468-469), making the issue of fraud one for the arbitrator.

A court presented with a claim that an arbitration clause is unenforceable because the written terms of the contract of which it forms a part were misrepresented should initially decide, as the majority does here, whether the party has shown that it lacked a reasonable opportunity to learn of the contract's terms. If the court decides, as in the case of most of the plaintiffs here, that the party seeking to avoid arbitration had a reasonable opportunity to learn the terms of the contract and discover the alleged misrepresentation, it is for the arbitrator and not the court to resolve the further questions of whether the alleged misrepresentation actually occurred and whether reformation of the contract or other equitable relief is justified under the circumstances. (If, unlike here, the party objecting to arbitration asserts that the particular misrepresentation amounts to fraud in the execution or the inducement of the arbitration clause, the court must first decide those questions as well.)

An arbitrator presented with a claim that the arbitration agreement is unenforceable because of fraudulent misrepresentation of the terms of the

written contract that contains it should decide that question first, for it potentially affects the arbitrator's jurisdiction to decide the merits of the other disputes between the parties. If the arbitrator decides that the contract should be rescinded or reformed to delete the arbitration clause because of fraud, then there is no enforceable agreement to arbitrate any further claims between the parties. (Because courts have the power to reform a contract or provide other equitable relief on this ground, an arbitrator has that power as well. *Advanced Micro Devices, Inc.* v. *Intel Corp.* (1994) 9 Cal.4th 362 [36 Cal.Rptr.2d 581, 885 P.2d 994] [arbitrators have greater remedial powers than courts]; see also *id.* at p. 391 (dis. opn. of Kennard, J.) [arbitrators should have same remedial powers as courts].)

In this respect, the position of an arbitrator presented with a defense of reliance on a misrepresentation of a written contract is similar to that of an arbitrator to whom the parties have expressly given the power to decide questions of arbitrability. In the latter case, if a party contends that a claim submitted for arbitration is outside the scope of the arbitration agreement, the arbitrator should decide that question first. If the arbitrator decides that the claim is not arbitrable under the arbitration agreement, the arbitrator should then issue a decision to that effect and leave the claim for judicial resolution. Here, too, if an arbitrator decides that, because of misrepresentations by the defendants as to the nature of the brokerage agreement signed by a given plaintiff, the brokerage agreement should be rescinded or equitably reformed to delete the arbitration clause, the logical consequence is that the arbitrator should then refuse to decide the merits of the plaintiff's other claims and leave them for judicial resolution.