Filed 8/6/13  Wendt v. UBS Financial Services CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MARGARET A. WENDT, | B241887 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. BC421811) |
| UBS FINANCIAL SERVICES, INC., | |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Los Angeles County, David L. Minning, Judge.  Affirmed.

Law Office of Jed Gladstein and Jed Gladstein for Plaintiff and Appellant.

Keesal, Young & Logan, Neal S. Robb, Bentley P. Stansbury III, and Bryan A. Gless for Defendant and Respondent.

_____

Plaintiff Margaret Wendt appeals from the trial court's order compelling her to arbitrate her dispute with defendant UBS Financial Services, Inc. (UBS) and the judgment confirming the resulting arbitration award. Plaintiff contends no agreement to arbitrate exists because as a result of her multiple sclerosis, she cannot read documents and UBS knowingly failed to inform her the brokerage contracts she executed with it contained an arbitration provision. She further contends that we may conduct a review of the arbitration award because it implicated her nonwaivable statutory rights, and that such review will disclose that the trial court erred in confirming the arbitration award. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    Motion to Compel Arbitration

#### 1.    *Plaintiff's Complaint*

On September 15, 2009, plaintiff filed a complaint alleging that she had suffered losses in connection with her brokerage account with UBS that was handled by UBS representative Stanford Baer (Baer). Plaintiff's operative first amended complaint filed November 9, 2009, alleged that she suffers from Multiple Sclerosis (MS) and as a result, has a cognitive dysfunction making it difficult for her to read and understand documents—in particular documents involving numbers and financial matters. Plaintiff alleged she had originally worked with Baer at Wells Fargo Bank, where she had an investment account he handled for her. Baer knew of plaintiff's cognitive difficulties, and that plaintiff was in special need of his personal fidelity and sober business judgment. Plaintiff told Baer that she did not want to lose a nickel of her money and would rather invest in bonds.

At an unspecified time, at Baer's urging, plaintiff moved her account from Wells Fargo to UBS, where Baer continued to handle her account. Sometime in the summer of 2007, plaintiff received information that led her to believe it was not safe to be invested in financial securities, and asked Baer to divest her of all such holdings. Baer told plaintiff she was mistaken, but told her he would sell such securities; however, he did not do so. On the contrary, plaintiff alleged that Baer invested an additional $50,000 in a new financial security

2

issued by Lehman Brothers. By having plaintiff so heavily invested in the stock market, UBS failed to honor her conservative investment objectives.

In July 2008, Baer left UBS and moved to Merrill Lynch. Unbeknownst to plaintiff while she was at UBS, at Baer's behest, she had replaced an ordinary Wells Fargo mortgage with one requiring repayment in full upon transfer of her account. UBS would not permit plaintiff to follow Baer to Merrill Lynch until she paid off her mortgage. As a result, plaintiff was unable to transfer her account at a time when stock values were falling and she was prevented from divesting her account of risky securities, resulting in a substantial loss of her investment portfolio. At this time, UBS assigned plaintiff's account to Robert Lovitt, who refused to trade any of plaintiff's holdings unless she signed a document cancelling her transfer to Merrill Lynch. Plaintiff sustained substantial losses as a result of Lovett's continuing refusal to sell her securities during the period July to September 2008.

Plaintiff's first amended complaint stated claims for negligence, breach of fiduciary duty, negligent misrepresentation, intentional misrepresentation, intentional infliction of emotional distress, invasion of privacy, financial elder abuse, and discrimination in violation of the Unruh Civil Rights Act.

2.  *UBS's Motion to Compel Arbitration*[1]

On December 9, 2009, UBS filed a motion to compel arbitration and stay proceedings. UBS asserted that plaintiff had signed a total of eight valid agreements to arbitrate with UBS between May 2004 and January 2008. The first four were signed in May 2004 when plaintiff opened four investment accounts with UBS. Each of the arbitration agreements was contained in plaintiff's brokerage agreements.[2] The four subsequent agreements were executed in September 2005, October 2005, September 2007, and January 2008.

---

[1] We set forth here solely the evidence proffered by the parties in connection with the motion to compel arbitration.

[2] The arbitration clauses appearing in Ms. Wendt's individual account agreements provide that "in accordance with the last paragraph of the Master Account Agreement entitled 'Arbitration' I am agreeing in advance to arbitrate any controversies which may arise with

3

Plaintiff's opposition asserted that due to her long-standing MS, she never understood that in signing the brokerage agreements that she had also agreed to arbitrate all disputes, and UBS's fraud in misrepresenting their contents negated her consent. She made her disability clear to Baer, and he understood that she would not be able to read any documents he asked her to sign; in turn, plaintiff reasonably relied on Baer's statements regarding the contents of the documents. Under *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394 (*Rosenthal*), her agreement to arbitrate was void as the product of fraud in the execution.

Plaintiff's declaration stated that she is a television producer, reporter, and spiritual journalist. Her television shows focus on the paranormal, which is her area of expertise. She suffers from MS and as a result has cognitive impairment; she is unable to understand or read numerical concepts or process numbers. Plaintiff cannot use a computer or read complicated materials. Reading numbers causes her to have panic attacks; she cannot balance a checkbook or use a calculator. Although her symptoms became apparent at age 18, she was not diagnosed with MS until age 30, and at the time of the motion to compel was 60 years old. Until 1997, she was married to Ben Webster, a successful entrepreneur who handled the couple's finances. In 1998, she was widowed, and inherited a small portion of Webster's estate. She employs Marvin Grossman, an accountant, at a salary of $5,000 per month to review her bank statements and bills. She trusted Baer to keep her advised of her financial portfolio.

---

among others UBS Financial Services in accordance with the terms outlined therein." (Boldface omitted.) The master account agreement provided: "Client agrees that the Account is subject to the arbitration rules of the NASD and that any and all controversies which may arise between UBS Financial Services and of UBS Financial Services' employees or agents and Client concerning any account, transaction, dispute or the construction, performance or breach of this Agreement, or any other agreement, whether entered into prior to, on or subsequent to the date hereof, shall be determined by arbitration." Plaintiff asserts there was only one agreement to arbitrate. The dispute is academic because she does not contend no brokerage account existed, only that there was only one agreement, rather than eight agreements.

As a result of plaintiff's condition and the death of her husband, she relies heavily on financial advisors to inform her verbally regarding documents she is executing. She entrusted her money to Bank of America, and later Wells Fargo after her advisor Brian McDermott moved there. McDermott introduced plaintiff to Stanford Baer, stating Baer was one of the best advisors at Wells Fargo. Plaintiff instructed Baer that she preferred conservative investments. Baer told her that he was moving to UBS, and from what he had told plaintiff, she believed her account was doing well.

When Baer moved to UBS, he requested that she sign documents that he explained were to transfer her account to UBS. She signed whatever documents he requested her to sign without reading them and signed them based upon his explanation. Some of the documents were just the signature page, and Baer seemed to be in a rush to have her sign them. Had she known the UBS agreements contained an arbitration clause, she would not have signed them. Further, the papers specified her investment objective was "moderate," rather than "conservative." Plaintiff is not a sophisticated investor.

In reply, UBS asserted it never misrepresented the nature of the brokerage contracts to plaintiff. On the contrary, UBS was not under a duty to explain the documents to her; rather, plaintiff had a duty to read and review the agreement before signing it. UBS submitted declarations contesting plaintiff's inability to read documents. Baer's declaration stated he began serving as plaintiff's financial advisor in November 2003, and moved to UBS in April 2004. Baer left UBS in July 2008 and moved to Merrill Lynch. When plaintiff opened her UBS account, Baer did not explain the terms of the account application or account agreement. At the time plaintiff executed the agreement, Baer believed she had been investing for many years and had transferred her account to different brokers a number of times and thus did not need, nor did she request, that he explain the terms of the agreements to her. Most importantly, at no time that Baer handled the account did plaintiff tell him that she had trouble

processing numbers or numerical concepts. Although Baer did not recall whether plaintiff told him she had MS, he did recall that she never informed him of any cognitive difficulties.[3]

In July 2008, another Merrill Lynch advisor, Robert Lovitt, took over plaintiff's account. Lovitt, who handled plaintiff's account from July 2008 to January 2009, did not recall plaintiff ever telling him that she had any cognitive impairments or difficulty processing numbers. In August 2008, he attended a meeting with plaintiff and her accountant Marvin Grossman at which they discussed a cash flow report, a sector allocation report, an asset allocation report, and a snapshot of her account. Lovitt personally observed plaintiff reviewing the documents and she did not mention having any difficulty doing so.

At the hearing, UBS pointed out that, as the moving party, it did not have the burden to establish the plaintiff's failure to read the documents was reasonable. Rather, plaintiff needed to establish her failure to read the agreements was reasonable given her condition. In that regard, plaintiff failed to submit admissible evidence that she suffered from a recognized medical condition that would prevent her from reading words on a page; there was no medical declaration from her physician. Thus, plaintiff's condition—an aversion to reading numbers—was not tantamount to blindness and thus did not bring her within the holding of *Rosenthal*, *supra*, 14 Cal.4th 394. Plaintiff requested the court to postpone its ruling to give her an opportunity to present evidence of her medical history, and she had a right to rely on Baer because he was her fiduciary. UBS countered that plaintiff had ample opportunity to procure her medical records.

The court granted the motion to compel arbitration and stay plaintiff's pending superior court action. The court found there was no medical documentation to support plaintiff's claim that she suffered from MS and as a result had cognitive difficulties understanding numbers; further, there was no evidence from which the court could find her

---

[3] Plaintiff asserts these declarations were improperly before the trial court because they were part of UBS's reply. However, given the procedural posture of the motion to compel arbitration, UBS did not have notice of the nature of plaintiff's opposition to its motion to compel at the time it filed the motion. Hence, UBS was required to rebut plaintiff's factual contentions in its reply.

failure to read the agreements was not the result of negligence. Rather, plaintiff was confronted with eight arbitration agreements which contained arbitration provisions, and admitted that she paid Grossman $5,000 annually to manage her money and administer her checking account—all of which indicated that plaintiff could have learned of the terms of the UBS agreements had she chosen to do so.

### 3. Plaintiff's Motion for Reconsideration

Plaintiff filed a motion for reconsideration in which she argued that the admissibility of her declaration was not raised by UBS, the relevant law on the issue was not before the court when it considered UBS's motion to compel. As a result, plaintiff submitted additional evidence and additional legal authorities on the issue of a party's ability to testify to his or her own illness in support.

Plaintiff submitted the declaration of Joseph Francis Hahn, M.D., who was not her treating physician and who is not a neurologist, in which he stated that he was neighbors with plaintiff when she was stricken with MS in 1982. Dr. Hahn stated that MS can affect many parts of the nervous system, and some sufferers of MS have cognitive impairment. Often such people do not appear to have anything wrong with them, but with cognitive impairment caused by MS, such people might not be able to make sense of financial documents.

Plaintiff also submitted the declaration of Marvin Grossman, plaintiff's personal accountant. In that capacity, Grossman reviewed her bank and investment statements but did not make investment decisions for plaintiff. Plaintiff did not have a financial background and did not have the ability to manage her financial affairs, and based on Grossman's observations, she did not understand financial documents. At the time plaintiff moved her account to UBS, Grossman witnessed plaintiff being shown financial documents by Baer, who did not explain them to her; plaintiff did not read the documents, which were not filled

7

out. No one at UBS asked Grossman to review the documents, and plaintiff did not ask him to do so because she was relying on UBS to explain the documents to her.[4]

Plaintiff submitted the declaration of Albert Thomas Wendt, her husband during the period 1969 to 1989. Wendt observed plaintiff was not able to function well with numbers, and first manifested this inability in 1970. Plaintiff could not read the menus in restaurants, and could not handle money at the market. When in restaurants, she would hold up a menu and pretend to read it, and then order what others ordered or what the waiter suggested. After the birth of their third child in 1980, plaintiff had difficulty seeing, slurred her speech, and had trouble walking. In 1982 plaintiff collapsed and spent several weeks at the Cleveland Clinic, where she was diagnosed with MS. Wendt helped plaintiff with her professional work by transcribing documents which plaintiff would verbally edit. After they divorced and plaintiff moved to California, Wendt helped her with the purchase of her home.

Plaintiff submitted medical documentation establishing she suffered from MS.

Plaintiff's declaration discussed the onset of MS and her development of coping mechanisms. Plaintiff was a straight-A student in college, and would have obtained a degree at Elmhurst College in Illinois except that her husband Tom Wendt was transferred to Iowa. Over the course of her 40-year professional career, plaintiff has been a fashion manager at Carson, Tiere, Scott (a department store chain in Chicago), did a morning television program for NBC, and a North Coast Magazine Sunday morning television show for CBS, which was the lead-in for Charles Kurault's Sunday "On the Road" show. Plaintiff worked on CBS's PM Magazine, a syndicated television show in which she did the style, society, and entertainment segments. Plaintiff was also a medical and consumer reporter for the nighttime news. After her divorce from Wendt, plaintiff moved to California and began producing her own documentaries emphasizing spiritual topics, people, and events. She partnered with Roland Perkins of CAA to create, write and co-produce Psychic Chronicles for Paramount

---

[4] Grossman submitted a supplemental declaration in which he stated that he did not witness plaintiff's initial document signing in May 2004, but witnessed a document signing when Baer moved from UBS to Bank of America in the summer of 2008.

Pictures. When she married Ben Webster, she moved to Canada for five years, where she helped her husband as his vice president of human resources. Although all of these positions required her to function at a high level, none of them required her to read and make sense of financial and legal documents. She relies on other people to explain legal and financial documents related to her job duties because she is incapable of reading them.

When she was widowed in 1997 and moved back to California, she had accumulated a nest egg and contacted Bank of America to set up an account with Brian McDermott. When McDermott moved to Wells Fargo, she moved with him. McDermott gave the account to Baer. Plaintiff did not have occasion to mistrust Baer, and he seemed genuinely concerned about plaintiff's well being and the need to preserve her life savings. She explained her problem reading financial documents to Baer. Her relationship and dealings with Baer were very good while she had her accounts at Wells Fargo. However, after she went to UBS, she lost her savings.

She remembered signing the contracts with UBS. Baer insisted on signing the documents on a particular day, although plaintiff was busy. She made time for him, but he was late, and when he arrived, plaintiff was ready to leave. They hurriedly signed the papers, and plaintiff remembers only being handed signature pages.

Plaintiff's attorney's declaration stated that he attempted to compile medical records relating to plaintiff's long-standing affliction with MS in response to the motion to compel arbitration, but many of the medical records were more than 20 years old and had been destroyed, and her initial treating physician in 1982 was deceased. However, several days before the hearing, they received plaintiff's medical records from 1982 establishing plaintiff's initial diagnosis with MS.

Jane Wang, M.D., a doctor specializing in neurology, was plaintiff's treating physician, and had known plaintiff since 2005 and assisted her in connection with plaintiff's diagnosis of MS.

UBS's opposition asserted that plaintiff could not rely on *Rosenthal*, *supra*, 14 Cal.4th 394 because plaintiff did not allege that Baer misrepresented the nature of the contract, but

9

instead asserted Baer's failure to interpret the contract for her, and in any event, she could not demonstrate reasonable reliance on any purported misrepresentations because she had eight opportunities to review the contract before signing it.

In reply, plaintiff submitted a declaration in which she claimed she told Lovitt about her cognitive problems, and disputed his version of events. Her attorney submitted a declaration in which he detailed his efforts to obtain plaintiff's 1982 medical records. A colleague of plaintiff submitted a declaration stating that she knew of plaintiff's disability and observed that plaintiff became very flustered and disoriented when required to read documents having to do with figures and financial information.

At the hearing, plaintiff argued that a party may testify to their own medical condition. The trial court denied plaintiff's motion for reconsideration because there was no new evidence or law.

**B.  UBS's Motion for Confirmation of Arbitration Award**

*1.  The Arbitration Briefs*

Plaintiff's statement of claim filed in the arbitration stated she has suffered from MS for over 30 years, which causes her to have difficulty reading certain kinds of documents, including contracts and other writings relating to her finances and investments. When she attempts to read such documents, the letters start to move around on the page, she becomes disoriented and dizzy, and goes into a panic. As a result, she is dependent upon others to explain the meaning of documents.

Following the death of her husband in 1997, plaintiff invested her life savings in bonds with Wells Fargo, where Baer became her financial advisor. She relied on Baer for all matters connected with her portfolio, and told Baer about her disability. In early 2004, Baer left Wells Fargo to work for UBS. At that time, Baer asked plaintiff to move her portfolio to UBS. Baer put some papers in front of her and asked her to sign the signature pages, stating the papers would allow him to move her account to UBS. He did not show her the rest of the documents, nor did he explain them. It was not until 2010 when plaintiff filed this action that she saw the account agreements and learned that her level of acceptable risk was "moderate" instead of

10

"conservative" and her secondary risk profile was "aggressive/speculative" rather than "conservative." Plaintiff never agreed to these account profiles. Indeed, following his move to UBS, Baer put plaintiff's money in over 120 stocks without her knowledge and consent, and concealed this fact from her. Baer convinced her to pay off her Wells Fargo mortgage and replace it with a UBS mortgage with a rate that he claimed was better, and he failed to tell her the mortgage would need to be paid off if she ever left UBS. When Baer wanted to move to Merrill Lynch in 2008, she could not move with him unless she paid off the mortgage. In August 2008, she met Lovitt and for the first time learned her money was in 120 different stocks. While the market was in a state of precipitous decline, Lovitt refused to allow her to sell her stocks unless she received authorization to transfer her portfolio to Merrill Lynch—a move which required her to pay off the UBS mortgage. Therefore, for several weeks, she struggled to make enough money to pay off the mortgage and a line of credit. In January 2009, she was finally able to do so, but in the interim, she had lost about $750,000. During this time, plaintiff alleged that Lovitt and other UBS employees acted with indifference to plaintiff's financial welfare and in disregard of her physical, mental, and emotional wellbeing. When plaintiff learned that a large portion of her savings had been lost, she asked UBS to assume financial responsibility for her losses, and UBS's attorney responded, "[w]e didn't leave you enough money to sue us."

Plaintiff asserted claims for negligence, breach of fiduciary duty, intentional misrepresentation, unauthorized trading, unsuitable investing, invasion of privacy, failure to supervise, intentional infliction of emotional distress, financial abuse of a dependent adult, unfair and deceptive business practices, and violation of the Unruh Civil Rights Act. Plaintiff asserted that UBS and its employees, including Baer and Lovitt, failed to invest her money properly, and UBS failed to properly supervise Baer and Lovitt, and that its conduct caused her severe emotional distress. Plaintiff sought economic and noneconomic damages of $750,000, $750,000 for pain and suffering, and statutory treble damages for $2.250 million for unfair business practices, punitive damages, interest, and attorney fees.

11

UBS responded that plaintiff executed numerous documents stating that her investment objectives and risk tolerance were moderate and that she sought income and capital appreciation. Further, plaintiff had served as vice president of finance for Helix Investments, her husband's investment company; served as the vice president of a Fortune 500 company; and served as the host of a radio program and television producer, writer and reporter for over 25 years. During the time plaintiff had her investments at UBS, she invested through Goldline International and hosted an internet program devoted to investing in precious metals through Goldline.

Baer first served as plaintiff's financial advisor in November 2003. Her first investment was $100,000, which she discussed in detail with Baer. In May 2004, when Baer moved to UBS, plaintiff met with him to address the objectives of her account. She represented that she had a $4 million net worth, 10 years experience investing, and executed numerous documents expressing her investment objectives as moderate-aggressive-speculative; her risk tolerance appeared on her account statements every month. Plaintiff transferred approximately $2 million in a diversified portfolio from Wells Fargo to UBS. Plaintiff spoke with Baer about all transactions in her account, and plaintiff's monthly statements detailed the allocation of her investments. During the period May 2004 to December 2007, plaintiff saw her account profit by $540,000. In October 2004, plaintiff took out a $1 million credit line with UBS with a variable interest rate. Initially plaintiff borrowed $25,000 against the credit line, and an additional $263,000 in October 2007.

In January 2008, plaintiff opened additional accounts with UBS valued at approximately $264,000 containing UBS stock, a Wells Fargo bond, and a structured product linked to a currency basket. Plaintiff did not conduct many transactions in this account. In January 2008, she used profits from this account to buy a Lehman Brothers structured product; in September 2008, Lehman Brothers filed for bankruptcy protection.

At the time Baer left UBS in July 2008, plaintiff elected to transfer her accounts along with him. Plaintiff had a $250,000 loan collateralized by the investments she intended to transfer out of UBS; thus, she could not transfer the collateral to Merrill Lynch unless the loan

12

was paid off. When Lovitt took over plaintiff's accounts, he met with plaintiff and Grossman. Plaintiff elected to pay off the UBS loan and by January 2009 had transferred her assets out of UBS.

UBS asserted that it consulted with plaintiff over all of her investments and properly discharged any duties it owed to plaintiff.

### 2. *Conduct of the Arbitration*

The arbitration was conducted before a panel of arbitrators of the Financial Industry Regulatory Authority (FINRA), and the parties mutually selected FINRA arbitrators in March 2011. The arbitration took place in October and November 2011. The proceedings were recorded manually and on tape.[5]

Plaintiff submitted a lengthy declaration dated August 18, 2011 in which she detailed her life with MS, explained why she cannot understand financial documents, how she copes with MS, her dealings with Baer, Lovitt, and UBS, how she was risk-averse financially,

---

[5] On September 17, 2012, plaintiff lodged with this court a CD audiotape of the "administrative proceedings" (FINRA arbitration hearings) in this matter. On December 10, 2012 plaintiff requested to augment the record with: (1) UBS's objections to the Declarations of her attorney Jed Gladstein, her friend Ann Schlichter, and her own declaration filed on July 6, 2010 in connection with the motion to compel arbitration; (2) the untranscribed CD audio record of the FINRA arbitration; (3) her arbitration brief; (4) her motion in limine dated August 31, 2011 in the arbitration proceedings, and the order granting the motion on September 26, 2011; and (5) her supplemental motion in limine dated October 31, 2011. On January 15, 2013, we denied the request to augment the record, except as to UBS's objections to plaintiff's declarations.

On January 8, 2013, plaintiff filed a motion for judicial notice of the same five documents. We deny plaintiff's request to take judicial notice of the five documents for the reason that the request is moot as to the first document, and plaintiff acknowledges the remaining four documents were not before the trial court. (Evid. Code, §§ 452, 459.) With respect to the untranscribed audio tape, it does not constitute administrative proceedings and is not properly lodged with this court. (Cal. Rules of Court, rule 8.122(b)(4)(B).) Furthermore, the record of oral proceedings in an appeal may take only three forms: (1) A reporter's transcript in conformity with California Rules of Court, rule 8.130; (2) an agreed statement under rule 8.134, and (3) a settled statement under rule 8.137. (Cal. Rules of Court, rule 8.120(b).) As the audio CD is not transcribed and does not comply with any of these rules, we disregard it.

13

Baer's departure from UBS and her portfolio's decimation. Plaintiff detailed how she had found "coping mechanisms to do things that other people can do normally. . . . I began to watch every word people said, and to imprint what they said to my memory. That is one of the primary ways I have been able to figure out what is going on in the world. And that particular skill served me professionally . . . . It allowed me to develop a career as an on-camera television personality . . . . Fortunately, the networks allowed their 'talent' to put extra shows in the can in advance, so I was able to have three or four shows ready to run if I had an attack that kept me from showing up at work." Plaintiff handled her condition with discretion because she found out she would be fired if people knew she had MS; she knew when to ask for help and when not to talk about it. The producers of her television shows accommodated her disability, and she developed personality skills and got jobs where she could memorize lines or ad-lib. Later, plaintiff became a television producer and developer of her own shows.

Plaintiff would suffer from severe stress, consisting of hallucinations, panic attacks, vertigo, and fainting, when confronted with personal matters of emotional importance. Her first husband took care of her contracts and their legal and financial matters during their marriage. After her divorce, plaintiff had to rely on other persons to explain documents to her. In 1996, plaintiff married Ben Webster, a wealthy businessman who owned Helix Investments. During her two-year marriage to Webster, who died in 1997, plaintiff's finances were handled by Webster. Webster put plaintiff on the board of directors of Helix and other companies; because he valued her people skills, he made her director of human resources at Helix. After Webster's death, plaintiff returned to Los Angeles with about $3 million that she inherited from Webster. Webster had told her never to put her money in stocks.

After her return to Los Angeles, plaintiff worked as a television host, writer, producer, director, and consultant. She worked on television specials and series, including American Idol, Band of Brothers, Into the Unknown, America's Psychic Past, and JFK: A Hero in Question. Plaintiff's day-to-day finances were handled by Bridgett Ryan and Marvin Grossman became her accountant. Plaintiff explained to Grossman that MS made it impossible for her to read and understand everyday bills, bank statements and other financial

14

documents. Grossman agreed to spend a few hours once or twice a month with plaintiff going over her bills, but Grossman was not her financial advisor.

Plaintiff told Baer she wanted to remain in conservative investments, and they agreed that he would never let her principal drop below $2 million. However, while at Wells Fargo and UBS, he put her money in stocks. Plaintiff had lost some money at Wells Fargo with a different broker, and Baer told her he would make the money back at UBS. Baer had her sign a document in October 2004 that opened a line of credit at UBS, and in May 2006 she sent him a fax authorizing her to borrow $10,000 on a UBS loan account, but she did not understand what the documents were for. Plaintiff put a numerology radio show on her website in 2007, and consulted a numerologist who told her the stock market would be getting bad in 2008. She called Baer and asked that he put her money in cash. He reassured her that nothing would happen to the market and that he was putting her money in cash. Up until the time Baer left UBS, she believed her money was safe.

The first plaintiff learned of the UBS loan was in July 2008 when Baer left UBS. When she tried to follow him to Merrill Lynch, UBS would not transfer her funds unless she paid off a $230,000 loan on her daughter's condominium. At the time in July 2008 when Baer told her he was leaving UBS, he wanted to meet plaintiff at a restaurant. Grossman agreed to go with plaintiff. Baer was in a hurry and said he wanted to get his clients out of UBS before it found out he was leaving. Baer gave her a piece of paper to sign, and the next day came by with more papers for her to sign. Baer told her it would take a couple of days to transfer her account to UBS and conditions were bad and he wanted to get her money into cash. UBS called her but she did not answer the phone. Grossman advised her to answer the phone because he thought the situation with Baer was "fishy." The next time UBS called, she answered the phone, and it was Lovitt. Lovitt gave her a sales pitch. She told him she was going with Baer. The next day Lovitt called and told her the paperwork was not in order and what she had signed was not valid. Plaintiff learned the truth about the mortgage on the condo and that she would have to pay it off to leave UBS. Baer told her none of it was true, and told her to tell Lovitt to sell into the rally. She found out Lovitt did not sell her stocks as

15

she asked him. She did not know what was going on with her money or her account, or how much money she was losing. Lovitt called her and called her names and was very insulting. She found his behavior to be sleazy, and she later learned Lovitt had called Grossman to complain about her. Later, Lovitt called to apologize, but during the month of July 2008 he continued to tell her that she could not transfer her money without paying off the loan. At the end of July she learned that Baer had put her money in stocks.

During July 2008, because she could not trade, her assets dwindled. Plaintiff enlisted the help of a friend to get her money out of UBS. When she got her money, she only had $732,000 left. During the time she was with UBS, it violated her privacy by sending her statements to her children. As a result of UBS's conduct, she has suffered from emotional distress and physical problems, including aggravation of her MS, high blood pressure, and stomach ulcers. In 2008, she fell three times, broke her ankle and leg on separate occasions, and in January 2009, she had a heart attack.

After the presentation of plaintiff's case in chief before the arbitrators, on November 23, 2011, UBS moved to dismiss on the grounds plaintiff had presented no evidence that her investment accounts lost money while at UBS. UBS argued that plaintiff admitted making false statements in her declaration filed in the trial court because she believed she would lose her case. UBS argued that plaintiff had presented no evidence that it was negligent, breached a fiduciary duty, made misrepresentations, conducted any unauthorized transactions in her account, made unsuitable investments, invaded her privacy, or engaged in any other wrongful conduct. On the contrary, the evidence contradicted plaintiff's claims and showed that she presented no evidence in support of them: for example, she sent an email in November 2006 stating, "should I take a loan from my line of credit or take stock money" and she permitted her son to receive copies of her statements. Finally, plaintiff presented no evidence in support of her damages.

Plaintiff's opposition argued that the arbitrators were ignoring her evidence, the UBS attorneys were causing plaintiff emotional distress, the arbitrators ignored plaintiff and refused to listen to her, one of the arbitrators was always looking at his computer, and plaintiff felt

16

belittled and demeaned. Plaintiff disputed the factual basis of the motion, contending that when she left UBS, she only had $750,000 left.

On December 8, 2011, the arbitrators heard the motion to dismiss by way of telephonic hearing. On December 9, 2011, the arbitrators granted the motion to dismiss.

In December 2011, plaintiff made a request for immediate suspension of the arbitrators based upon bias and other wrongful conduct of the arbitrators. On January 18, 2012, FINRA responded to plaintiff's letter, denying her request but offering plaintiff the opportunity to challenge the panel pursuant to FINRA Rules. FINRA requested a response by January 25, 2012. On January 26, 2012, plaintiff declined by fax to challenge the arbitrators.

2. *The Arbitrator's Award, Motions for Confirmation and Vacation*

On February 3, 2012, the arbitrators served their award, finding in favor of UBS and dismissing plaintiff's claims in their entirety. The award contained no findings of fact or other written analysis of plaintiff's case. The arbitrators charged $22,200 in forum fees to plaintiff, and $1,800 to UBS.

On March 12, 2012, UBS moved to confirm the award. Simultaneously, plaintiff moved to vacate the award, contending she was compelled to go to arbitration in violation of law, and FINRA panel of arbitrators harbored bias. Her counsel's declaration stated that "despite the expedited nature of the arbitration due to plaintiff's Multiple Sclerosis, the arbitrators postponed the hearing for months in order to accommodate the vacation plans of UBS'[s] counsel. The unctuous deference with which the arbitrators treated counsel for UBS was so blatant that when objections were made to his behavior during the course of the hearing, the arbitrators pronounced rulings without giving plaintiff the opportunity to be heard on the objections. . . . Despite their claim to have read plaintiff's pleadings and considered her evidence, the statements of the arbitrators on the record showed that they did not do so. And when they thought they were in a private session but forgot to turn off a live video feed to an adjacent room, the arbitrators were caught on television admitting that they would not read and consider some of the most cogent and compelling evidence showing how UBS was able to deceive and defraud the plaintiff due to her MS cognitive disabilities."

In opposition to plaintiff's motion to vacate, UBS argued that plaintiff failed to establish that the award was procured by bias, fraud, corruption, or other undue means, and instead only offered vague and conclusory allegations. On the contrary, the arbitrators rescheduled hearings at plaintiff's request; installed audio/visual equipment so that plaintiff could have her own room to watch the proceedings via closed-circuit television; permitted plaintiff to present some testimony by way of her lengthy declaration; and scheduled the arbitration to accommodate UBS's counsel's need to attend a meeting during one week. UBS also contended that plaintiff failed to specify what evidence the arbitrators refused to admit and failed to make any showing of evidence that would have affected the arbitrators' conclusion.

On April 5, 2012, the trial court confirmed the arbitration award in favor of UBS, and on April 25, 2012, entered judgment in favor of UBS.

## DISCUSSION

### I. Formation of Arbitration Agreement

Plaintiff argues that the undisputed evidence at the hearing on the motion to compel arbitration established fraud in the execution of the UBS agreements signed May 3, 2004; on this issue the evidence established she was incapable of reading and understanding the signature page Baer handed to her to sign. Further, the evidence established Baer had a confidential relationship with plaintiff because he had handled her account prior to her coming to UBS, and she was not negligent for failing to consult her accountant concerning the meaning of the UBS agreement because her accountant only handled her checking account. Finally, she argues the trial court erred in denying her motion for reconsideration because she had the right to testify to the symptoms of her disease, and in ignoring the declarations she submitted in support of her opposition. UBS counters that plaintiff never informed either broker (Baer or Lovitt) that she had difficulty processing numbers or a cognitive aversion to financial documents, nor was there any medical documentation to support her claim of such a cognitive difficulty, and plaintiff's motion for reconsideration did not put forth any new facts or law and was properly denied.

18

### A.	Agreement to Arbitrate

Code of Civil Procedure section 1281[6] provides that predispute arbitration agreements are "valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." Under section 1281.2, a party may petition the court to order arbitration of a controversy; the court may deny the petition if it finds the party resisting arbitration did not agree to arbitrate. Such petitions are determined in the manner provided by law for the making and hearing of motions. (§ 1290.2.) The petitioner bears the burden of proving an arbitration agreement. The party claiming a defense bears the burden of proving the defense. (*Rosenthal*, *supra*, 14 Cal.4th at p. 413.) We review the trial court's resolution of factual issues for substantial evidence. (*NORCAL Mutual Ins. Co. v. Newton* (2000) 84 Cal.App.4th 64, 71.)

A court can consider a claim that a party was fraudulently induced to include an arbitration clause (as is the case here) in a contract. (*Prima Paint v. Flood & Conklin* (1967) 388 U.S. 395, 402–404 [87 S.Ct. 1801, 18 L.Ed.2d 1270]; *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 973.) Parties dealing at arm's length generally owe no duty to explain the terms of a contract. A party's failure to explain to the other the meaning and effect of an arbitration clause is ordinarily not a fraudulent nondisclosure of facts. (*Cohen v. Wedbush, Noble, Cooke, Inc.* (9th Cir. 1988) 841 F.2d 282, 286–287; *Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 710 [party is presumed to have read contract and know its contents].) "California law . . . requires that the plaintiff, in failing to acquaint himself or herself with the contents of a written agreement before signing it, not to have acted in an objectively unreasonable manner. One party's misrepresentations as to the nature or character of the writing do not negate the other party's apparent manifestation of assent, if the second party 'had reasonable opportunity to know of the character or essential terms of the proposed contract.'" (*Rosenthal*, *supra*, 14 Cal.4th at p. 423.) "To make out a claim of fraud in the execution, . . . plaintiffs must show their apparent assent to the contracts—their

---

[6] All statutory references are to the Code of Civil Procedure unless otherwise indicated.

signatures on the client agreements—is negated by fraud so fundamental that they were deceived as to the basic character of the documents they signed and had no reasonable opportunity to learn the truth." (*Id.* at p. 425.)

However, a special relationship may exist between the parties such that one party has the duty to explain the terms of the contract to the other party, such as the relationship between a broker and a client. The scope of the fiduciary duty between brokers and clients varies with the facts of the relationship. (*Rosenthal*, *supra*, 14 Cal.4th at p. 425.) In *Rosenthal*, 24 bank customers sued over agreements to arbitrate, claiming they were deceived about the nature of the agreements. The bank led customers to believe a securities salesman worked for the bank; the salesman led the customers to believe agreements containing arbitration clauses were actually mere formalities to open an account. With respect to some of the plaintiffs, their reliance on what the salesman told them was not a defense to enforcement because of their negligence in failing to read the agreements. However, other plaintiffs who were illiterate and blind, because they had a prior relationship with the defendant, could claim fraud in the inducement because a duty arose on the part of the bank to explain the terms of a contract to them. (*Id.* at pp. 426–428.)

Here, plaintiffs seeks to bring herself within the second group of *Rosenthal* plaintiffs by asserting that UBS had a duty to explain the contract to her because of her MS. This argument fails for two reasons. First, the trial court, sitting as factfinder, was within its powers to disbelieve her statements that she had a disability that prevented her from reading financial documents, and that she made her disability known to UBS brokers Baer or Lovitt; the trial court was within its powers as factfinder to credit the statements of Baer and Lovitt in their declarations that they had no knowledge of any disability of plaintiff such that they would be required to inform her of the terms of the account agreement. If UBS had no knowledge of plaintiff's disability, or its consequences, its lack of notice of any duty arising therefor is fatal to her claim of fraud in the inducement. Second, the trial court, sitting as factfinder, was within its powers to conclude that plaintiff, given her inability to read financial documents, should have shown the documents to her accountant Grossman or some other

person to learn their contents, or asked Baer or Lovitt to explain the account agreements to her in sufficient detail to acquaint her with their contents but without going beyond her level of comprehension given her cognitive difficulties. The trial court was therefore justified in concluding plaintiff was negligent in failing to learn the bare bones of the account agreements and thus because she failed to make her disability known and failed to seek to learn the contents of the documents, she is not within the holding of *Rosenthal*, *supra*, 14 Cal.4th 394.

### B. *Motion for Reconsideration*

Section 1008, subdivision (a) provides in relevant part that a party may apply for reconsideration of a prior court ruling on the basis of "new or different facts, circumstances, or law." The party must demonstrate "what new or different facts, circumstances, or law are claimed to be shown." (§ 1008, subd. (a).) Section 1008 is jurisdictional; "[n]o application to reconsider any order or for the renewal of a previous motion may be considered by any judge or court unless made according to this section." (§ 1008, subd. (e).) Section 1008 is intended to reduce the number of reconsideration motions heard by judges. (*Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1098.) The party seeking reconsideration based on new or different facts must also provide a satisfactory explanation why the evidence was not presented sooner. (*Jones v. P.S. Development Co., Inc.* (2008) 166 Cal.App.4th 707, 724.) We review the trial court's ruling under the abuse of discretion standard. (*New York Times Co. v. Superior Court* (2005) 135 Cal.App.4th 206, 212.)

Here, the trial court did not err in denying plaintiff's motion for reconsideration. Even assuming the additional medical information would have helped her case given the trial court's finding that plaintiff did not seek to make her disability known or to learn the contents of the documents, plaintiff presented no reason why the medical records could not have been presented earlier aside from the fact they dated from 1982 and were difficult to obtain. It is unlikely that plaintiff had not seen a doctor for over 30 years concerning her MS, a very serious illness, such that diagnosis and treatment was not ongoing and contemporary medical information from her current treating physician would be easily obtained.

## II. Confirmation of Arbitrator's Award

Plaintiff's appeal focuses on three of her claims (her claims for financial abuse, unfair business practices, and unlawful discrimination in violation of the Unruh Act) and contends the arbitrators prevented her from vindicating these unwaivable statutory rights and issued an award with insufficient factual and legal findings to enable this court to determine whether plaintiff was able to vindicate such statutory rights; further; the award here, which was without reason or fact and rendered by partial arbitrators, exceeded the power of the arbitrators; and the arbitrators dismissed her statutory claims under an unconstitutional rule.

The scope of judicial review of arbitration awards is extremely narrow because of the strong public policy in favor of arbitration and according finality to arbitration awards. We will not review an arbitrator's decision for errors of fact or law, evaluate the validity of an arbitrator's reasoning, or consider the sufficiency of the evidence supporting an arbitrator's award. (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 11.) As our Supreme Court recognized as early as 1852, "'The arbitrators are not bound to award on principles of dry law, but may decide on principles of equity and good conscience, and make their award *ex aequo et bono* [according to what is just and good].'" (*Ibid.*, quoting *Muldrow v. Norris* (1852) 2 Cal. 74, 77.)

As a result, the grounds for vacating or correcting an arbitration award are strictly limited by statute. Under section 1286.2, the grounds on which a court may vacate an award are if it was (1) procured by corruption, fraud, or undue means, (2) issued by corrupt arbitrators, (3) affected by prejudicial misconduct on the part of the arbitrators, or (4) in excess of the arbitrators' powers. (*Cable Connection, Inc. v. DIRECTV, Inc.* (2008) 44 Cal.4th 1334, 1340; § 1286.2, subd. (a).) There is a presumption in favor of the validity of the award, and the challenger bears the burden of establishing a claim of invalidity. (*Betz v. Pankow* (1993) 16 Cal.App.4th 919, 923.) Absent conflicting extrinsic evidence, whether the arbitrator exceeded his or her powers in granting relief, and thus whether the award should have been vacated on that basis, is reviewed on appeal de novo. (*Reed v. Mutual Service Corp.* (2003)

106 Cal.App.4th 1359, 1365 ["whether the award was made in excess of the arbitrators' contractual powers" is a question of law].)

Generally, because we may not review the merits of the controversy between the parties, the validity of the arbitrator's reasoning, or the sufficiency of the evidence supporting the arbitration award, "'it is within the power of the arbitrator to make a mistake either legally or factually. When parties opt for the forum of arbitration they agree to be bound by the decision of that forum knowing that arbitrators, like judges, are fallible.'" (*Moncharsh*, *supra*, 3 Cal.4th at p. 12.) Thus, unless the arbitration agreement provides otherwise, arbitrators have no obligation to state reasons for their award. (*Severtson v. Williams Construction Co.* (1985) 173 Cal.App.3d 86, 92.) Thus, the arbitrator is usually not required to submit findings of fact or detail the process by which the result was reached or give any reasons for the award: "It is not the finding on issues that is required; it is the determination thereof." (*Cothron v. Interinsurance Exchange* (1980) 103 Cal.App.3d 853, 860.) The parties may, by agreement, require the arbitrator to issue with the "award a written discussion sufficient to [allow] limited judicial review to enforce or vacate the . . . award." (*Biller v. Toyota Motor Corp.* (9th Cir. 2012) 668 F.3d 655, 666.)

A private arbitration award does not constitute state action and there is no due process right to judicial review. (*Rifkind & Sterling, Inc. v. Rifkind* (1994) 28 Cal.App.4th 1282, 1292.) We review the trial court's order de novo, while the arbitrator's award is entitled to deferential review. (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 376, fn. 9.)

### A. Unwaivable Statutory Rights

Although we may not review the arbitrators' decision for errors of fact or law, an arbitrator exceeds his or her power within the meaning of section 1286.2 and the award is properly vacated where granting finality to the arbitration would be inconsistent with a party's unwaivable statutory rights. (*Pearson Dental Supplies, Inc. v. Superior Court* (2010) 48 Cal.4th 665, 677 (*Pearson Dental*).) In such instance, a reviewing court may set aside the award for manifest errors of law. (*Id.* at pp. 679–680.) Whether a statutory right is

23

unwaivable in an arbitration context is determined based on the context and purpose of the specific statute in question. (*Bickel v. Sunrise Assisted Living* (2012) 206 Cal.App.4th 1, 13.) Generally, such unwaivable rights include claims for elder abuse (Welf. & Inst. Code, § 15600 et seq.) (*Bickel*, *supra*, 206 Cal.App.4th at pp. 11–12), certain statutory rights under the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) and the Labor Code, as well as *Tameny*[7] claims for wrongful discharge in violation of public policy. (See *Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th 1064, 1081–1085; *Gentry v. Superior Court* (2007) 42 Cal.4th 443, 455.) Although such claims may be subject to arbitration (*Boghos v. Certain Underwriters at Lloyd's of London* (2005) 36 Cal.4th 495, 506–508), arbitrator's rulings regarding such rights are not entitled to the normally deferential standard of review. (*Pearson Dental*, *supra*, 48 Cal.4th at pp. 679–680.)

Specifically addressing the issue of unwaivable statutory rights in the context of "a mandatory employment arbitration agreement, i.e., an adhesive arbitration agreement that an employer imposes on the employee as a condition of employment," the Supreme Court has recognized "'that an arbitration agreement cannot be made to serve as a vehicle for the waiver of statutory rights created by the FEHA' [citation], because the enforcement of such rights was for the public benefit and was not waivable." (*Pearson Dental*, *supra*, 48 Cal.4th at p. 677; see also *Board of Education v. Round Valley Teachers Assn.* (1996) 13 Cal.4th 269, 272–277 [judicial review and vacatur of arbitration award is proper when upholding arbitrator's decision would be inconsistent with the protection of a party's clear statutory rights].) To ensure full vindication of an employee's statutory rights in an arbitral forum, there must be both a written decision and judicial review "'''sufficient to ensure the arbitrators comply with the requirements of the statute.'''" (*Pearson Dental*, at p. 677; accord *Cable Connection*, *supra*, 44 Cal.4th at p. 1353, fn. 14.)

The Court in *Pearson Dental* declined to opine broadly as to the appropriate level of judicial review required in every case involving an employee's unwaivable statutory rights.

---

[7] *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167.

However, the Court emphasized the arbitrator's written decision should not be viewed as "an idle act, but rather as a precondition to adequate judicial review of the award so as to enable employees subject to mandatory arbitration agreements to vindicate their rights under FEHA." (*Pearson Dental*, *supra*, 48 Cal.4th at p. 679.) Crafting only a rule sufficient to resolve the case before it, the Court concluded the arbitrator's "clear legal error" in finding the employee's FEHA claim to be time-barred, thus precluding any hearing on the merits of the claim, and the corresponding failure to provide a written decision revealing "'the essential findings and conclusions on which the award [was] based,'" required the award's vacatur. (*Ibid*.)

Here, plaintiff waived any contention that the arbitrators failed to explain the reasoning and factual basis for their award sufficient to enable her to seek review of the panel's ruling on her unwaivable statutory rights. Plaintiff failed to raise the issue of the insufficiency of the arbitrator's award vis-à-vis findings on unwaivable statutory rights in the trial court when she sought vacation of the award. Waiver is the relinquishment of a known right, but can also refer to "loss of a right as a result of a party's failure to perform an act it is required to perform." (*St. Agnes Medical Center v. PacificCare of California* (2003) 31 Cal.4th 1187, 1195, fn. 4.) A party to an arbitration who has knowledge of irregularity in the proceedings cannot sit by and take part in the proceedings and later object on the basis of the irregularity; such party "'waives any objection on account of such irregularity for he cannot thus take the chance of a favorable [outcome].'" (*Blatt v. Farley* (1990) 226 Cal.App.3d 621, 629.)

In addition, aside from the fact plaintiff cites no statutory ground for overturning the arbitration award, plaintiff fails to explain by reference to fact and law, other than through conclusory statements, why the FINRA panel's ruling against her resulted in her being unable to vindicate her nonwaivable statutory rights. Even without factual findings in the award, the motion to dismiss was clear on plaintiff's failure to make a prima facie case on these unwaivable claims, or to establish that UBS wrongfully put her money in stocks without her knowledge. Plaintiff presents no developed argument on why the Panel's dismissal was erroneous. "'The reviewing court is not required to make an independent, unassisted study of

the record in search of error or grounds to support the judgment. . . . [E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' [Citation.]" (*McComber v. Wells* (1999) 72 Cal.App.4th 512, 522–523.) In any event, our review of the record indicates that in spite of her medical condition, plaintiff failed to present evidence to establish that she did not know her monies were in stocks, or that her professed ignorance of the contents of her UBS portfolio was only dispelled when she attempted to move to Merrill Lynch and she was unable to liquidate her portfolio.

### B.    *Dismissal Under FINRA Rules, rule 12504(b)*

Plaintiff argues that FINRA Rules, rule 12504(b), the rule under which UBS moved to dismiss the arbitration, is unconstitutionally vague and ambiguous because it does not provide notice of the standards that must be met in order to avoid or defeat such a motion. We disagree.

FINRA Rules, rule 12504(b) provides only that a motion to dismiss may be made. However, the FINRA Arbitrator's Guide provides that the "respondent may ask the Panel to dismiss the claim on the grounds that the claimant failed to prove the allegations in the statement of claim or failed to prove a right to recovery." (FINRA 2013 Arbitrator's Guide at p. 39.) The Guide also provides that the evidence shall be viewed in the light most favorable to the claimant. (*Ibid.*) These standards track those applied to a motion for nonsuit under section 581c, which also must be made on a noticed motion. Under section 581c, the test is whether plaintiff has presented a prima facie case, namely, whether the evidence introduced is sufficient to support a verdict for plaintiff on appeal. "A nonsuit in a jury case . . . may be granted only when disregarding conflicting evidence, giving to the plaintiffs' evidence all the value to which it is legally entitled, and indulging every legitimate inference that may be drawn from the evidence in the plaintiffs' favor, it can be said that there is no evidence to support a jury verdict in their favor." (*Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 583; *County of Kern v. Sparks* (2007) 149 Cal.App.4th 11, 16.) Thus, FINRA Rules, rule 12504(b) providing for a dismissal of an arbitration where the claimant has failed to make

26

out a prima facie entitlement to relief after the claimant's presentation of his or her case-in-chief is not unconstitutionally vague.

### C. Bias of Arbitrators

Plaintiff requests that if we reverse and remand, that we order a jury trial because she cannot get a fair hearing in front of the FINRA arbitrators. She contends that after the conclusion of the arbitration, she initiated an investigation into the FINRA arbitrators and FINRA administration by the Securities Exchange Commission, the Civil Rights Division of the Office of the United States Attorney, and the California Office of the Attorney General and the Office of the Los Angeles County District Attorney. Due to these investigations, it "stretch[es] credulity beyond the breaking point" to believe that the FINRA arbitrators would be neutral.

"'An impression of possible bias in the arbitration context means that one could reasonably form a belief that an arbitrator was biased *for or against a party for a particular reason*.' [Citation.]" (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 389.) Section 1281.91, subdivision (d) provides that if any ground specified in section 170.1 for disqualification of a judge, including on grounds of bias or prejudice toward a party, section 170.1, subdivision (a)(6)(B) exists, "a neutral arbitrator shall disqualify himself or herself upon the demand of any party made before the conclusion of the arbitration proceeding." "The standard for disqualification under subdivision (a)(6)(C) of section 170.1 is objective. [Citation.] Thus, an award may be vacated if ' . . . the record reveals facts which might create an impression of possible bias in the eyes of the hypothetical, reasonable person. [Citation.]' [Citation.] Actual bias is not required. [Citation.] 'Where the average person could well entertain doubt whether the [adjudicator] was impartial, appellate courts are not required to speculate whether the bias was actual or merely apparent, or whether the result would have been the same if the evidence had been impartially considered and the matter dispassionately decided [citations], but should reverse the judgment and remand the matter to a different [adjudicator] for a new [hearing] on all issues. [Citation.]' [Citation.]" (*Roitz v. Coldwell Banker Residential Brokerage Co*. (1998) 62 Cal.App.4th 716, 723.) When

reviewing a charge of bias, we do not use the litigants' necessarily partisan views as the applicable frame of reference.  Rather, potential bias and prejudice must clearly be established and "statutes authorizing disqualification of a judge on grounds of bias must be applied with restraint.  [Citation.]  'Bias or prejudice consists of a "mental attitude or disposition of the judge towards [or against] a party to the litigation. . . ."'  [Citation.]  Neither strained relations between a judge and an attorney for a party nor '[e]xpressions of opinion uttered by a judge, in what he conceived to be a discharge of his official duties, are . . . evidence of bias or prejudice.  [Citation.]'  [Citation.]"  (*Roitz*, at p. 724.)

Here, aside from plaintiff's subjective views, the record reflects no bias or potential bias.  UBS presented evidence the arbitration panel made effort to accommodate plaintiff's special needs, including providing her with a room in which to view the proceedings and permitting her to present testimony through her declaration.  Plaintiff's counsel's belief the panel exhibited "unctuous deference" to UBS's counsel is not sufficient to establish that the Panel's ruling was made on an improper basis.  Plaintiff fails to specify what evidence the arbitrators stated they would not read, or how such evidence was essential to plaintiff's case; rather, she makes conclusory allegations that fail to develop her claim of bias.  Finally, to the extent plaintiff complains about future events in front of another FINRA arbitration panel, such argument is mooted by our affirmance of the judgment.

## DISPOSITION

The judgment is affirmed.  The parties are to bear their own costs on appeal.

NOT TO BE PUBLISHED.


JOHNSON, J.

We concur:


ROTHSCHILD, Acting P. J.


CHANEY, J.

28